Michael SHEETS, Plaintiff–Appellee,

v.

Ozean MOORE, Defendant–Appellant.

No. 94–2457.

United States Court of Appeals,
Sixth Circuit.

Argued April 9, 1996.

Decided Oct. 4, 1996.

district court held that the prohibition was unconstitutional and that the defendant was not entitled to qualified immunity. We **REVERSE.**

## I.

Plaintiff Michael Sheets is an inmate at the Carson City Temporary Facility ("CCTF"). On August 1, 1991, he received a notice of rejection letter from the prison mail office regarding a catalog from "P.O. Box 1264, Englewood, Florida." The notice stated that "catalog & order form for women not allowed." On August 7, 1991, defendant Ozean Moore, a resident unit manager at CCTF, conducted a hearing regarding the rejection. Moore upheld the rejection because the catalog constituted "free advertising," under Michigan Department of Corrections ("MDOC") policy directive PD–BCF–63.03(N)(8) [1].

Plaintiff filed a pro se complaint on February 17, 1993, later amended, alleging that defendant violated plaintiff's First Amendment rights in upholding the rejection. Plaintiff sued defendant in his official capacity, seeking injunctive and declaratory relief, and in his personal capacity for money damages.

On May 25, 1993, defendant filed a motion for summary judgment, arguing that he acted in accordance with a valid prison regulation rationally related to prison security. Defendant also raised qualified immunity as a defense. The district court held that defendant failed to articulate a legitimate penological purpose supporting the rejection of free advertising materials to plaintiff. The court also refused to grant qualified immunity, concluding that at the time Moore rejected plaintiff's mail, plaintiff's right to receive such mail was clearly established. The court therefore sua sponte granted summary judgment to plaintiff. It awarded plaintiff $1 in

Michael Sheets, Jackson, Alvan P. Knot, Pandilidis, Lloyd & Knot (argued and briefed), Lansing, MI, for Plaintiff–Appellee.

Lisa C. Ward, Asst. Attorney Gen., Office of the Attorney General, Lansing, MI, for Defendant–Appellant.

Before: SUHRHEINRICH and SILER, Circuit Judges; ALDRICH, District Judge.[*]

SUHRHEINRICH, J., delivered the opinion of the court, in which SILER, J., joined. ALDRICH, D.J. (pp. 169–70), delivered a separate opinion concurring in part and dissenting in part.

## SUHRHEINRICH, Circuit Judge.

In this appeal of a prisoner's civil rights claim under 42 U.S.C. § 1983 we consider whether a Michigan policy directive that prohibits free advertising, fliers, and other bulk mail is constitutional. Also at issue is whether a state prison official who enforced the policy is entitled to qualified immunity. The

---

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

**1.** MDOC policy PD–BCF–63.03(N)(8) provides in relevant part:

(N) Prisoners shall not be allowed to receive the following items or publications as they are considered to be a threat to the order and security of an institution or to the rehabilitation of prisoners:

. . . .

(8) Free advertising material, fliers, and other bulk rate mail except that received from a recognized religious organization sent in care of the institutional chaplain.

nominal damages and enjoined defendant from rejecting plaintiff's mail solely on the basis that it is free advertising or other bulk mail. This appeal by defendant followed.

## II.

We review a grant of summary judgment de novo. *EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). Summary judgment is appropriate when the pleadings, affidavits, and other submissions demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Defendant argues that rejection of the catalog, and therefore his ruling upholding that rejection, did not violate plaintiff's First Amendment rights because the decision was based upon a valid prison regulation prohibiting free advertising. Defendant also contends that he was entitled to qualified immunity because, at the time of his action in this case, there was no clearly established statutory or constitutional right of a prisoner to receive free advertising or other bulk rate mail. We begin with the immunity question.

### A.

A state official is entitled to qualified immunity to the extent that his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The standard for evaluating an official's conduct is "objective legal reasonableness." *Id.* at 819, 102 S.Ct. at 2739. That is, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citation omitted).

In determining whether a constitutional right is clearly established, a district court must find binding precedent by the Supreme Court, its court of appeals, or itself. *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988).

On the date of defendant's decision, August 7, 1991, it was clearly established that inmates retain their First Amendment right to receive mail, but that the right is subject to legitimate penological interests. *Thornburgh v. Abbott,* 490 U.S. 401, 407–09, 109 S.Ct. 1874, 1878–79, 104 L.Ed.2d 459 (1989); *Turner v. Safley,* 482 U.S. 78, 84–89, 107 S.Ct. 2254, 2259–62, 96 L.Ed.2d 64 (1987); *Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2539–40, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez,* 416 U.S. 396, 408–10, 94 S.Ct. 1800, 1808–10, 40 L.Ed.2d 224 (1974), *overruled in part by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Parrish v. Johnson,* 800 F.2d 600, 603 (6th Cir.1986); *Brooks v. Seiter,* 779 F.2d 1177, 1180 (6th Cir.1985). In other words, although an inmate has a First Amendment right to receive mail, an inmate's constitutional rights may be limited if the prison regulations are "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261. Further, in *Abbott,* the Supreme Court specifically held that "regulations affecting the sending of a 'publication' ... to a prisoner must be analyzed under the *Turner* reasonableness standard." *Abbott,* 490 U.S. at 413, 109 S.Ct. at 1881.

To date, there are no Supreme Court or appellate decisions which directly address a prisoner's right to receive nonsubscription, bulk rate mail. Thus the question becomes whether the "unlawfulness" of PD–BCF–63.03(N)(8) was "apparent" at the time Moore made his decision. *Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039. By 1991, the Supreme Court had already upheld prison regulations prohibiting packets of union publications mailed in bulk to several inmates to

be distributed to the general prison population, *Jones*, 433 U.S. at 130–31, 97 S.Ct. at 2540–41; restricting inmates' receipt of hardback books unless mailed directly from publishers, *Bell*, 441 U.S. at 550, 99 S.Ct. at 1880; banning correspondence between inmates of different institutions, *Turner*, 482 U.S. at 91–92, 107 S.Ct. at 2262–63; and authorizing a prison warden to reject any publication for good reason pursuant to specific criteria on case-by-case basis, *Abbott*, 490 U.S. at 419, 109 S.Ct. at 1884–85. Furthermore, this court had ruled that prison officials could limit receipt of magazines, books, and other types of publications to "publishers only," *Ward v. Washtenaw County Sheriff's Dep't*, 881 F.2d 325, 330 (6th Cir.1989); and ban material advocating homosexuality on a case-by-case basis. *Espinoza v. Wilson*, 814 F.2d 1093, 1099 (6th Cir.1987) (per curiam).

In contrast, the Supreme Court had struck down as unconstitutional mail censorship regulations proscribing inmate correspondence that, *inter alia*, "unduly complain[ed]" "magnif[ied] grievances," and expressed "inflammatory political, racial, religious or other views", because they allowed prison officials to apply their own personal prejudices. *Martinez*, 416 U.S. at 415–16, 94 S.Ct. at 1812–13. This court had also ruled that a prison guard's arbitrary interference with prisoner's incoming mail violates the First Amendment, *Parrish*, 800 F.2d at 604; and that prison officials could not withhold personal subscription publications. *Brooks*, 779 F.2d at 1180–81 (noting that "[l]ike personal correspondence, a subscription represents the exercise of volition by both sender and recipient").

■ In light of the foregoing precedent, we think that an official in defendant's position could have reasonably concluded that PD–BCF–63.03(N)(8) was constitutional. First, it is based on specific, content-neutral

criteria, like *Abbott*, and leaves little discretion for a prison official, unlike *Martinez*. Second, bulk rate mail, unlike personal correspondence or a personal subscription, does not represent the exercise of volition by the recipient, as was the case in *Brooks*.[2] Third, the prison regulation is ostensibly grounded in concerns for prison order and security and the rehabilitation of prisoners. *See* PD–BCF–63.03(N) ("Prisoners shall not be allowed to receive the following items or publications as they are considered to be threat to the order and security of an institution or to the rehabilitation of prisoners...."). In short, we do not think that the unlawfulness of PD–BCF–63.03(N)(8) was "apparent" by any means.

In concluding that the law was clearly established, the district court relied upon two unpublished decisions, both of which held that the total ban on all bulk rate mail in PD–BCF–63.03(N)(8) was unconstitutional because not grounded in some legitimate penological interest. *See Wright v. Toombs*, G89–50641 (W.D.Mich. July 16, 1990) (holding that plaintiff was entitled to summary judgment on First Amendment claim where officials deprived him of newsletter sent to him bulk rate because no legitimate penological purpose supported blanket ban of bulk mail in PD–BCF–63.03; and denying defendants qualified immunity because reasonable official would have known directive was unconstitutional); *Herndon v. Hawley*, 2:89–50641–CV–308 (W.D.Mich. March 27, 1991) (enjoining defendants from withholding nonsubscription newsletters sent bulk rate to plaintiff under PD–BCF–63.03; following *Wright* ). However, as noted, these decisions are unpublished and therefore carry no precedential weight. They have no binding effect on anyone other than the parties to the action.

Further counseling against reliance on *Herndon* and *Wright* is a published decision

---

2. Individually-addressed bulk rate mail arguably represents the exercise of some volition on behalf of commercial senders to communicate with inmates. In *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), the Supreme Court made clear that the same standard of review applies to incoming mail regardless of who sent it. *Id.* at 410–14 & n. 9, 109

S.Ct. at 1879–82 & n. 9. Furthermore, *Brooks v. Seiter*, 779 F.2d 1177 (6th Cir.1985), decided prior to *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) and *Abbott*, used the least restrictive analysis of *Martinez*, which the Supreme Court expressly rejected in *Abbott* as it applies to incoming mail. *See Abbott*, 490 U.S. at 413–14, 109 S.Ct. at 1881–82.

from a coordinate court, the Eastern District of Michigan, holding that PD–BCF–63.03(N)(8) is valid as related to legitimate penological interests. *See Kalasho v. Kapture,* 868 F.Supp. 882 (E.D.Mich.1994) (holding that prisoner's First Amendment rights were not violated by defendants' refusal to deliver to him a running shoe catalog he had ordered that had been sent third class/bulk rate). Albeit issued after the district court's decision here, its issuance illustrates that the law was unsettled. If federal district judges could reasonably disagree over the constitutionality of the regulation, then it can fairly be said that a reasonable official would not have known that his conduct violated a clearly established right.

For these reasons, we hold that the district court erred in holding that defendant was not entitled to qualified immunity.

### B.

■ In any event, we think the policy directive at issue is constitutional as reasonably related to legitimate penological interests under the reasonableness standard of *Turner.* There the Supreme Court set forth four factors that are relevant to this determination. First is whether the regulation is legitimate and neutral, and rationally related to the underlying government objective, *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2261–62. Second is whether the prisoners have alternative means of exercising the right. *Id.* at 90, 107 S.Ct. at 2262. Third is the impact accommodation will have on guards and other inmates, and on the allocation of prison resources in general. *Id.* Fourth is the absence of ready alternatives. *Id.*

In assessing these factors, we are guided by the *Kalasho* court. Regarding the first *Turner* factor *Kalasho* reasoned:

> In this case, PD–BCF–63.03 is both legitimate and neutral. Defendant states in his supplemental brief that allowing all third class/bulk rate mail could create a tremendous influx of incoming prisoner mail. .... Such an influx of incoming mail typically results in a tremendous amount of mail, thereby presenting the problem to prison officials of insuring that contraband

is not smuggled into the prison via the vast amount of third class mail.

> In addition to the problem of insuring that each piece of bulk mail does not contain contraband, fire hazard and accumulation of excess property is of continuing concern to prison officials. Any accumulated combustible material in the finite space accorded inmates is an obvious fire hazard and a concern to the safety and security of other inmates, officials, and the institution. Further, accumulated third class/bulk rate mail poses a security problem such that prisoners could conceivably secret contraband materials amongst it, and make cell searches more difficult. This again has implications for the safety of all inmates, officials, and the institution.

> It is clear to this Court that the allowance of third class/bulk rate mail to inmates poses legitimate security concerns. The language of policy directive 63.03(N) makes it explicitly clear that third rate/bulk class mail is being restricted because the Department of Corrections considers it to be a threat to the order and security of the institution or to the rehabilitation of the prisoner. *See* PD–BCF–63.03(N). Protecting prison security is a purpose central to all other correction goals. *Thornburgh v. Abbott,* 490 U.S. 401, 413–16, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989). As a consequence, the regulation's goal is legitimate, as it relates to legitimate security concerns.

> Furthermore, the regulation at issue here, PD–BCF–63.03(N)(8), is undeniably neutral. In assessing neutrality it is important to inquire whether prison regulations restricting inmates First Amendment rights operate in a neutral fashion without regard to the content of the expression. *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987). The policy directive bans all bulk rate mail regardless of content, thereby remaining neutral.

*Kalasho,* 868 F.Supp. at 887.

As for the second *Turner* factor, the court remarked that:

> [The] catalogs remain available to inmates by way of the prison store, thereby provid-

ing one alternative means by which plaintiff could view the Eastbay running shoe catalog.

Also, nothing prevents plaintiff, or any other prisoner, from pre-paying the postage on any catalog and having it mailed first or second class.

*Id.*

The *Kalasho* court analyzed the third *Turner* factor:

[A]ccommodation of the asserted right will have an impact on both inmates and staff. As discussed above, the allowance of unlimited third class/bulk rate mail raises security and safety concerns for both inmates and staff. Furthermore, given the amount of third class/bulk rate junk mail that is generated, prison officials would be quickly overwhelmed in the mechanics of sorting and delivering to each prisoner—possibly vast amounts of—third class/bulk rate mail while ensuring no contraband enters the prison. Moreover, the prison's resources, which are limited, could be significantly reduced in attempting to process the bulk rate mail, thereby decreasing resources (including both time and money) available to process the more important first class mail, including an inmate's legal mail.

*Id.* at 888.

Concerning the final *Turner* factor, *Kalasho* first noted that its purpose is to prevent an "exaggerated response" by prison administrators, but at the same time it was not a least restrictive alternative test. *Id.* (citing *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262). Thus, the court found that:

It appears to this court that there is not an alternative measure which both could be readily implemented and would not "impose more than a de minimis cost on the pursuit of legitimate corrections." *Id.* 482 U.S. at 93, 107 S.Ct. at 2264. In addition, policy directive 63.03(N)(8) does not appear to be an "exaggerated response" to the problem which the directive attempts to address. Moreover, plaintiff has not presented to this Court an alternative that could fully accommodate plaintiff's rights at a de minimis cost to the prison's valid penological interests. Therefore, this fac-

tor does not provide evidence that the policy directive is unreasonable.

*Id.*

██ We find this reasoning persuasive. Moreover, plaintiff has not established that PD–BCF–63.03(N)(8) is somehow an "exaggerated response" to legitimate administration concerns. We therefore adopt the *Kalasho* court's analysis on each of the four points, and likewise conclude that MDOC policy directive PD–BCF–63.03(N)(8) is reasonably related to legitimate penological security interests, and is not an unconstitutional violation of plaintiff's First Amendment rights.

The Supreme Court has often reminded that courts are ill-suited to the inordinately difficult task of running a prison, and in general should defer to the expert judgment of prison officials. *Abbott,* 490 U.S. at 409, 109 S.Ct. at 1879; *Turner,* 482 U.S. at 84–85, 89, 107 S.Ct. at 2259–60, 2261–62; *Jones,* 433 U.S. at 128, 97 S.Ct. at 2539; *Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807–08. We think such deference is appropriate here.

## III.

For the foregoing reasons, the judgment of the district court is **REVERSED** and the matter **REMANDED** with instructions to enter judgment in favor of defendant Moore in his individual capacity, and vacate the injunction entered against Moore in his official capacity.

ALDRICH, District Judge, concurring in part and dissenting in part.

I fully concur with the majority holding that the district court erred in deciding that Moore was not entitled to qualified immunity.

The majority also insists, however, that the district court erred in ruling that MDOC policy directive PD–BCF–63.03(N)(8) is an unconstitutional violation of Sheets' First Amendment rights. According to the majority, the policy directive is reasonably related to legitimate penological interests under the reasonableness standard set forth in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and therefore withstands

Sheets' First Amendment challenge. Because the majority forms this legal conclusion without considering the factual circumstances associated with the prison mailing system, I respectfully dissent from that portion of the majority's holding.

As established by the majority, *Turner* instructs the Court to examine four factors in determining whether MDOC policy directive PD–BCF–63.03(N)(8) is reasonably related to legitimate penological interests. *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2261–62. In doing so, the majority improvidently accepts the reasoning set forth in *Kalasho v. Kapture,* 868 F.Supp. 882 (E.D.Mich.1994) by dismissing the rule that summary judgment is appropriate *only* when the pleadings, affidavits, and other submissions demonstrate "that there is no genuine issue as to any material fact," Fed.R.Civ.P. 56(c), and that the initial burden of proving the absence of a material fact is on the moving party. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989).

In analyzing the first *Turner* factor, the *Kalasho* court concluded that the directive is both neutral and legitimate.[1] While MDOC PD–BCF–63.03(N)(8) is obviously neutral, I believe a genuine issue of material fact exists as to its legitimacy. As the moving party in the instant action, Moore failed to provide evidence substantiating the concern that allowing all third class/bulk rate mail would create a "tremendous influx" of incoming prisoner mail. The record simply tells us nothing about the total volume of bulk rate mail that the prison would, or could expect to, receive absent the policy directive. Al-though the courts must accord deference to state officials in their administration of prison facilities, *Turner,* 482 U.S. at 85, 107 S.Ct. at 2259–60; *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974), the courts cannot disregard an inmate's constitutional rights whenever prison officials create a possible, but unsubstantiated, security concern.

Furthermore, according to the Domestic Mail Manual, Section E370, only qualified organizations may be authorized to mail at bulk rates. Excluded from this list of qualified organizations, and thus ineligible to use bulk rates, are individuals. As with the concern of a "tremendous influx" of incoming mail, nothing in the record remotely suggests that the listed qualified organizations would use bulk mailing for smuggling contraband into prison facilities. Finally, although I agree that the accumulation of bulk mail could create a fire hazard, this concern is based upon the assumption that, in fact, the prisons would be subjected to a tremendous influx of bulk mail. Accordingly, I believe a genuine issue of material fact exists with regard to the directive's legitimacy.[2]

---

1. Again, the *Kalasho* court reasoned:

   Defendant states in his supplemental brief that allowing all third class/bulk rate mail could create a tremendous influx of incoming prisoner mail.... Such an influx of incoming mail typically results in a tremendous amount of mail, thereby presenting the problem to prison officials of insuring that contraband is not smuggled into the prison via the vast amount of third class mail.

   *Kalasho,* 868 F.Supp. at 887.

2. The factual determination of whether the acceptance of bulk rate mail would create a tremendous influx of mail also affects examination of the third *Turner* factor. The *Kalasho* court asserted that accommodating prisoners by accepting bulk rate mail would have an adverse impact on both inmates and staff. *Kalasho,* 868 F.Supp. at 888. Here, the *Kalasho* court had the following concerns: the allowance of unlimited bulk rate mail raises security and safety concerns; the amount of mail generated would quickly overwhelm prison officials in the mechanics of sorting and delivering to each prisoner, while ensuring that no contraband enters the prison; and the prison's resources could be reduced in attempting to process the bulk rate mail, which would affect the resources dedicated to sorting the more important first class mail. *Id.* Assuming, however, that a tremendous influx of mail would not persist, and that the possibility of organizations smuggling contraband in the mail is not real, these concerns would cease to exist.