**Paul Edward JONES, Plaintiff–Appellee,**

v.

**Donal CAMPBELL, Defendant–Appellant.**

No. 00–6201.

United States Court of Appeals, Sixth Circuit.

Nov. 9, 2001.

Before BATCHELDER and COLE, Circuit Judges;  GWIN, District Judge.*

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

## OPINION

R. GUY COLE, JR., Circuit Judge.

In this prisoner civil rights action, Defendant–Appellant Donal Campbell, Commissioner of the Tennessee Department of Corrections ("TDOC"), appeals the district court's order granting partial summary judgment in favor of Plaintiff–Appellee Paul Edward Jones. Jones brought suit pursuant to 42 U.S.C. § 1983, alleging that TDOC's policy prohibiting inmates from receiving bulk-rate mail violated his First Amendment rights. Jones sought injunctive, declaratory, and monetary relief. Both parties filed motions for summary judgment, and by order dated June 8, 2000, the district court adopted in part the magistrate judge's report and recommendation. The court: (1) granted Jones's motion for partial summary judgment as to his claim for injunctive relief, and denied his claim for monetary damages; (2) granted Defendant's motion for summary judgment as to Jones's claim for monetary relief, and denied it as to Jones's claim for injunctive relief; (3) granted Jones's request for a declaratory judgment; and (4) dismissed Jones's claim for damages. Defendant filed a motion for reconsideration or to alter or amend the judgment, which the district court granted in part and denied in part by order dated August 1, 2000, correcting an error in the injunction previously ordered. On appeal, Defendant argues that the district court erred because TDOC's prison mail regulation is reasonably related to legitimate penological interests. For the reasons that follow, we REVERSE the judgment of the district court.

## BACKGROUND

The facts giving rise to this action are undisputed. Jones is an inmate at TDOC, which maintains a mail policy requiring that all mail coming into the correctional facility be opened and examined by the mail room staff for contraband before distribution to the inmates. Effective May 15, 1997, Defendant approved Policy Change Notice ("PCN") 97–33, which made the following revision to TDOC's prison mail policy:

> Bulk rate mail will not be processed by institution mail room staff. Inmates who want to receive catalogs or other items that are normally sent bulk rate must pre-pay first or second class postage for the material to be delivered by TDOC staff.

The purpose of PCN 97–33 was to prevent unsolicited mail from being sent to inmates due to concerns about the significant amount of time and resources expended in the examination and delivery of these unsolicited materials by mail room staff. The policy also was to address concerns about fire safety, sanitation, and difficulty in conducting searches of inmate cells. However, the policy had the unintended effect of preventing inmates from receiving magazines, books, newspapers, and other materials to which they had subscribed or placed orders, as those publications typically are sent via the bulk rate.

As a result of the policy, Jones stopped receiving catalogs and magazine issues to which he had subscribed. To remedy this unintended effect of the policy, Defendant approved PCN 97–55, effective August 1, 1997, which superseded PCN 97–33 and states in relevant part:

> Books received from publishers or book clubs, magazines, and newspapers are assumed to have been purchased; therefore, when sent into the institution as bulk rate mail, these items will be accepted unless the printed material is denied by the warden under the provisions outlined in Section VI.(I) of this policy. All other bulk rate mail will not be processed by institution mail room staff. Inmates who want to receive other items that are normally sent bulk

rate must pre-pay first or second class postage for the material to be delivered by TDOC staff.

During June, July, and part of August 1997, Jones did not receive some or all of his magazines and catalogs, which were shredded by the mail room staff pursuant to PCN 97–33. After PCN 97–55 went into effect, Jones began to receive his magazines and books without any difficulty but still did not receive his catalogs, as those items are not covered under PCN 97–55. Jones testified that although he tried to prepay first-class postage by sending letters to eight different magazine and catalog publishers, only one magazine accepted his payment and mailed the publication first class. Jones testified:

> Things have got better in the last year, but for the first year-and-a-half, I was having—I couldn't get the catalogs in, and we're still having trouble getting the catalogs in .... [I still have] trouble sometimes with Burpee publishing catalog, that's the only one I'm having trouble with now. The rest of them come in okay.

Jones filed suit against Defendant in his official and individual capacity, seeking compensatory and punitive damages as well as an injunction from the enforcement of PCN 97–33 and a declaratory judgment. The matter was referred to a magistrate judge, who issued a report and recommendation.

With regard to the suit against Defendant in his official capacity, the magistrate judge properly found that Jones's claim for monetary damages was barred by the Eleventh Amendment and that only injunctive relief was available. The magistrate judge went on to find that Jones was entitled to such injunctive relief because TDOC's prison mail policy violated his First Amendment rights. With regard to Jones's suit against Defendant in his individual capacity, the magistrate judge held that Defendant was entitled to qualified immunity because his actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." The magistrate judge dismissed Jones's claim for damages and held that a declaratory judgment was not proper, stating:

> Because defendant's infringement upon plaintiff's first amendment rights is permissible in the context of prison administration, with only the reasonableness of such infringement in light of underlying penological interests subject to review and subsequent relief, the Magistrate Judge concludes that the legality of defendant's conduct in promulgating the policies at issue is not subject to binding adjudication with preclusive effect, but must be considered in light of the interests asserted by both parties to any future litigation.

Although the district court disagreed with the magistrate judge on the issue of Jones's entitlement to a declaratory judgment,[1] the court agreed with the report and recommendation in every other respect and entered the following order for injunctive relief:

> Accordingly, the defendant and all persons in the Tennessee Department of Corrections acting in concert with him or at his direction are ENJOINED from enforcing mail policy PCN 97–55 so as to allow an inmate to receive a catalogue or other publication specifically labeled in the name of the inmate, provided the publication otherwise satisfies the seri-

---

1. The district court did not explain its disagreement with the magistrate judge on the issue of a declaratory judgment. The district court simply stated, "[T]he Court concludes that the Magistrate Judge's Report and Recommendation should be adopted, except for the dismissal of the declaratory judgment claim."

ous security concerns, other than those considered in the attached Memorandum.

Defendant filed a motion for reconsideration or to alter or amend the judgment, arguing that the injunction improperly makes reference to the court's "Memorandum" in violation of Fed. R. Civ. P 65(d), which states that every order granting an injunction shall state the reasons for its issuance in specific terms and "not by reference to the complaint or other document." The district court granted Defendant's motion in part and amended its June 8, 2000, order as follows:

> It is ORDERED that the defendant and all persons in the Tennessee Department of Corrections acting in concert with him or at his direction are EN-JOINED from enforcing mail policy PCN 97–55 so as to allow an inmate to receive a catalogue or other publication specifically addressed in the name of the inmate, provided the publication does not pose a serious security concern by distribution to the named inmate. In the event of such a security threat, the defendant shall have leave to such relief from this order by filing a motion with the Court.

Defendant raises the following assignments of error: (1) the district court erred in determining that TDOC's prison mail regulation is not reasonably related to legitimate penological interests; (2) the injunction violates the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, because it extends further than necessary to correct any violation of plaintiff's constitutional rights and is not the least intrusive means necessary; and (3) the district court abused its discretion in requiring Defendant to seek the court's permission before withholding publications that may pose a security threat. This appeal follows.

## DISCUSSION

### I. Standard of Review

We review a district court's decision to grant a motion for summary judgment de novo. *See Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996). We also review de novo the denial of a motion to alter or amend the judgment pursuant to Fed. R.Civ.P. 59 when that motion seeks review of a grant of summary judgment. *See Smith v. Wal–Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir.1999).

### II. First Amendment

In *Brooks v. Seiter*, 779 F.2d 1177 (6th Cir.1985), this Court recognized:

> The Supreme Court has made it clear that prison inmates retain all first amendment rights not incompatible with their status as prisoners, or with the legitimate penological objectives of the corrections system. The Court has recognized that receiving mail from an outside source, an interest in communication shared by prisoners and their correspondents, is such a first amendment right. This right is subject to restriction in the interests of prison security, but such restrictions must further legitimate penological objectives, in a manner no more restrictive than necessary.

*Id.* at 1180 (internal quotation marks and citations omitted). While noting that the Supreme Court never expressly has held that the first amendment rights shared by prisoners and their correspondents extends to mail-ordered publications, the *Brooks* Court found that a subscription or single order of a particular publication more closely resembles a personal correspondence than a mass mailing and, therefore, is entitled to first amendment protection. *See id.* In evaluating the extent to which a prison policy may infringe upon an

inmate's free speech rights without violating the First Amendment, we look to the factors set forth in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), to determine whether the policy is "reasonably related to legitimate penological interests." *Id.* at 89.

> First is whether the regulation is legitimate and neutral, and rationally related to the underlying government objective. Second is whether the prisoners have alternative means of exercising the right. Third is the impact accommodation will have on guards and other inmates, and on the allocation of prison resources in general. Fourth is the absence of ready alternatives.

*Sheets v. Moore,* 97 F.3d 164, 168 (6th Cir.1996) (citing *Turner,* 482 U.S. at 89–90).

In *Sheets,* we applied these four factors in a context similar to the one before us. There, a prisoner brought a § 1983 action challenging the constitutionality of a prison regulation prohibiting inmates from receiving "free advertising material, fliers, and other bulk-rate mail except that received from a recognized religious organization sent in care of the institutional chaplain." *See id.* at 165. Alleging a first amendment violation, the plaintiff sued the prison manager in his official capacity for injunctive relief and his individual capacity for damages. Reversing the district court, we held that, with regard to damages, the defendant was entitled to qualified immunity. *See id.* at 167. We also held that the regulation was constitutional because it was "reasonably related to legitimate penological interests under the reasonableness standard of *Turner.*" *See id.* at 168. In applying *Turner,* the *Sheets* Court did not undertake its own analysis; rather, it expressly relied upon, and adopted, the reasoning set forth in *Kalasho v. Kapture,* 868 F.Supp. 882 (E.D.Mich.1994). Although we are not bound by *Kalasho,* we are bound by *Sheets,* which held:

> We ... adopt the *Kalasho* court's analysis on each of the four points, and likewise conclude that [the prison's] policy directive ... is reasonably related to legitimate penological security interests, and is not an unconstitutional violation of plaintiff's First Amendment rights.

*Sheets,* 97 F.3d at 169. Thus, we must look to the analysis in *Kalasho* to determine the binding effect and precedential value of *Sheets.*

In *Kalasho,* the prisoner brought a first amendment challenge to a regulation prohibiting inmates from receiving catalogs delivered at the bulk mail rate. *See* 868 F.Supp. at 887. The plaintiff had ordered, and never received, a catalog from the Eastbay Running Company, which had been sent via the bulk mail rate. Holding that the regulation satisfied *Turner,* the *Kalasho* Court held: (1) the regulation satisfied the first factor because allowing third class/bulk-rate mail to be distributed to inmates posed legitimate security concerns, and the policy banned all bulk-rate mail regardless of content, thereby remaining neutral; (2) the regulation satisfied the second factor because Eastbay catalogs were available to inmates by way of the prison store, thereby providing an alternative means by which the plaintiff could access the catalog, and also because the plaintiff could prepay the postage on the catalog and receive it via first or second class; (3) the regulation satisfied the third factor because the resources needed to process the vast amount of mail sent via the bulk rate made accommodation of the asserted right burdensome; and (4) the regulation satisfied the fourth factor because there did not appear to be an alternative measure which could be readily implemented. *See id.* at 887–88.

■ Here, the policy likewise seems to be legitimate and neutral. The regulation simply is an effort to curb the influx of

unsolicited "junk" mail and to reduce the burden faced by the mail room workers who must process this mail. The vast amount of mail sent via the bulk mail rate poses an undue burden on the staff, creating a fire hazard and a threat to safety, as workers must check every item for contraband. Further, the regulation is content-neutral in that it applies equally to all bulk-mail items not covered by the express exceptions.

With regard to the second factor, Jones presented evidence establishing that no alternative means of receiving his requested catalog exists, as the publisher will not accept prepayment to ship the publication first or second class. Unlike the case in *Kalasho* and *Sheets*, there does not appear to be a viable alternative means for Jones to receive the one catalog that he still has trouble getting. Defendant argues, however, that the magistrate judge and district court erred in focusing on Jones's means of obtaining one specific catalog. We agree.

In *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), the Supreme Court explained:

> A second factor the Court in *Turner* held to be relevant in determining the reasonableness of a prison restriction is whether there are alternative means of exercising the right that remain open to prison inmates. As has already been made clear in *Turner* and *O'Lone* [*v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ], the right in question must be viewed sensibly and expansively. The Court in *Turner* did not require that prisoners be afforded other means of communicating with inmates at other institutions, nor did it in *O'Lone* require that there be alternative means of attending the Jumu'ah religious ceremony. Rather, it held in *Turner* that it was sufficient if other means of expression (not necessarily other means of communicating with inmates in other prisons) remained available, and in *O'Lone* if prisoners were permitted to participate in other Muslim religious ceremonies. As the regulations at issue in the present case permit a broad range of publications to be sent, received, and read, this factor is clearly satisfied.

*Id.* at 417–18 (internal quotation marks, citations, and alterations omitted). Thus, the issue is not whether Jones has an alternative means of receiving one particular catalog, but rather, whether he has alternative means of exercising his first amendment right to receive, send, and read publications generally. Jones testified that he is receiving all of his books and magazines with no difficulty, and PCN 97–55 allows all inmates to receive books, magazines, newspapers, and any other items sent first or second class. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (internal quotation marks, citations, and alterations omitted). Accordingly, the district court erred in weighing this factor in favor of Jones, and we owe judicial deference to Defendant on this point.

With regard to the third factor, we must determine what sort of impact an accommodation would have on the guards and inmates, and on the allocation of prison resources in general. Defendant submitted evidence establishing that the processing and delivery of all bulk-rate mail has a sizeable impact on prison resources and slows down the delivery of more important first-class mail. Nevertheless, the magistrate judge determined that "in light of the current practice of reviewing bulk mail for obviously solicited items, accommodation of plaintiff's right to receive those items

bearing his name and inmate number would not impose any particularly onerous burden on the mail room staff." The magistrate judge based this conclusion on the testimony of various prison mail room workers, which revealed that despite TDOC's policy against delivering bulk-rate mail, it is common practice of the mail room to process and deliver those items which appear to have been solicited by the inmates, even those items that have been delivered at the bulk rate.[2] Thus, the district court held that this factor weighed in favor of Jones.

Finally, the fourth factor requires us to determine whether "the absence of a ready alternative" to addressing the prison's legitimate penological interest justifies the chosen regulation. *See Turner*, 482 U.S. at 90.

> This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Id.* at 90–91. Here, the magistrate judge found that delivering mail addressed to the inmate by name and inmate number or that contained one of the "endorsements" discussed above was one such alternative, and the prison could implement that alternative at a *de minimis* cost while still advancing its legitimate penological interests. Defendant argues, however, that the

district court's determination that delivering solicited items easily could be accommodated without burdening mail room staff is premised on the baseless assumption that all solicited catalogs contain an "endorsement" of some sort. We agree.

Although there may be an indirect relationship between a sender's use of an endorsement and the question of whether it was solicited and paid for—*i.e.*, a publisher may be more likely to use endorsements to ensure the delivery of a subscription for which a customer has paid—any conclusion that looking for an endorsement would fully accommodate the inmates' first amendment rights is unsupported. As TDOC's assistant commissioner testified, it can be quite difficult to determine whether a particular catalog has been solicited.

In sum, we find that the third *Turner* factor may weigh in favor of Jones, but the first, second, and fourth factors clearly weigh in favor of Defendant. Thus, we hold that the district court erred in striking down PCN 97–55 as unconstitutional, as the regulation is reasonably related to legitimate penological interests.

## CONCLUSION

Accordingly, we REVERSE the judgment of the district court.

---

**2.** The testimony indicates that certain "endorsements" on bulk rate publications enable mail room workers to distinguish items that have been solicited by inmates from those that have not. For example, items that bear an inmate's name or inmate number, or that

contain endorsements such as "address correction requested," "change of service," "forwarding guaranteed," or "return service guaranteed" typically are processed and delivered to the inmate.