Harold H. THOMPSON,
Plaintiff–Appellant,

v.

Donal CAMPBELL, Commissioner, Tennessee Department of Correction; Jim Rose, Assistant Commissioner; Fred Raney, Warden, Northwest Correctional Facility; Tony Mays, Administrative Lieutenant; Defendants–Appellees.

No. 02–5588.

United States Court of Appeals, Sixth Circuit.

Nov. 20, 2003.

Harold H. Thompson, pro se, Tipton-ville, TN, for Plaintiff–Appellant.

Kimberly J. Dean, Deputy Attorney Gen., Stephanie R. Reevers, Asst. Attorney Gen., Office of the Attorney General, Nashville, TN, for Defendant–Appellee.

Before: NELSON, GIBBONS, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

Harold Thompson is a Tennessee prison inmate, a self-proclaimed anarchist, and an inventive litigant. In December 2000, he sued several Tennessee prison officials under 42 U.S.C. § 1983, challenging the validity of several prisoner-mail policies adopted by the State of Tennessee, including most notably the State's policy of withholding incoming mail from "anarchist" organizations. Thompson claims that this policy suppresses communication in violation of the First (and Fourteenth) Amendment and denies him meaningful access to the courts in violation of the Fourteenth Amendment. Thompson also raises a First Amendment challenge to a policy that prohibits inmates from receiving books, magazines, and newspapers from sources other than their publisher. Finally, Thompson raises First Amendment and due process challenges to a prison policy prohibiting the delivery–and in many cases requiring the destruction–of incoming standard-rate mail without notice to the inmate. The district court entered a judgment rejecting Thompson's claims as a matter of law, and we AFFIRM.

## I.

Harold Thompson is serving a life sentence at the Northwest Correctional Complex in Tiptonville, Tennessee. While confined in prison, Thompson has become (perhaps understandably) a vigorous critic of government authority, embracing "anarchism" as a political philosophy.

No less understandably, the Tennessee Department of Corrections (the "Department" or "TDOC") goes to great lengths to avoid "anarchy" in its institutions, including in its Northwest Correctional Complex. To that end, the Department has adopted a policy of withholding mail that may pose a threat to institutional security, including mail that, "in the opinion of the warden,"

could "reasonably be considered" to "[a]dvocate, facilitate, or otherwise present a risk of lawlessness, . . . anarchy, or rebellion against government authority." TDOC Policy No. 507.02(VI)(C)(3). This policy also covers, among other things, mail that could "reasonably be considered" to "[c]ontain obscene photographs, pictures, or drawings" or "materials specifically found to be detrimental to prisoners' rehabilitation because [they] could encourage deviate criminal sexual behaviors." TDOC Policy No. 507.02(VI)(C)(3)(e) & (h).

On numerous occasions between November 1999 and October 2000, prison mailroom staff forwarded Mr. Thompson's mail to the Warden, Fred Raney, for review under this policy. In each case, Raney personally reviewed the items and determined that they posed a security threat. Each time, Thompson received a memo notifying him that prison officials had intercepted the particular piece of mail. The policy then provided Thompson an opportunity to appeal the Warden's decision to the Assistant Commissioner of the Tennessee Department of Correction, Jim Rose. The policy, however, does not allow an inmate access to the intercepted material for purposes of the appeal. Only if successful on appeal does the inmate learn anything more than the name of the intercepted publication. On several occasions, Mr. Thompson successfully invoked the appeals process and ultimately received mail that initially had been withheld.

On at least two dozen occasions, however, Thompson failed to obtain relief through these administrative appeals, and prison officials returned the mail to its sender–twenty–two times due to "anarchist" content and two times due to obscene or sexual content. According to the Warden, he based his decision to reject these items on his professional judgment that they might potentially disrupt the se-

curity of the institution. Thompson challenges the policy on its face and as applied to these particular items.

The Department has two other policies at issue in this case. One prohibits prisoners from receiving books, magazines, and newspapers unless their publisher or a recognized distributor sends them directly to the inmate. TDOC Policy No. 5702(VI)(C)(5) ("Printed materials may be received by inmates in an unlimited amount, provided they are mailed directly from the publisher(s) or recognized commercial distributor."). The other policy prohibits prisoners from receiving "standard rate mail" (also known as "bulk rate mail"). Under the policy, the prison mail room will return such items when the sender guarantees return postage, but otherwise destroys them. Exempted under this policy are "[b]ooks, magazines, and newspapers received directly from the publisher or a recognized distributor" because these materials "are assumed to have been purchased." Prisoners "who want to receive other items that are normally sent bulk rate mail" must make arrangements to prepay first-class or second-class postage. TDOC Policy 5702.02(VI)(D). Prison officials, however, do not give inmates notice, whether before or after the fact, that they have received standard rate mail.

In December 2000, Thompson filed a § 1983 action challenging these policies and seeking declaratory and injunctive relief (but no damages). He brought the suit against four Tennessee prison officials in their official and individual capacities: Donal Campbell, the Commissioner of the Tennessee Department of Corrections; Jim Rose, the Assistant Commissioner; Fred Raney, the Warden; and Lieutenant Tony Mays, the Mailroom Supervisor (and a Correctional Officer).

Though it is by no measure a model of clarity, Thompson's complaint, fairly read, raises six distinct claims: (1) the Department's policy regarding anarchy-related mail violates the First Amendment on its face because it is overbroad, vague, and not reasonably related to legitimate penological interests; (2) the anarchy-related mail policy, as applied to the particular items enumerated in Thompson's complaint, violates the First Amendment; (3) the "publishers only" rule violates the First Amendment; (4) the standard-rate mail rule violates the First Amendment; (5) the standard-rate mail rule violates the Fourteenth Amendment by providing for the rejection or destruction of such mail without notice; and (6) the anarchy-related mail policy denies Thompson meaningful access to the courts in violation of the Fourteenth Amendment.

The prison officials moved for summary judgment, arguing that these claims all fail as a matter of law. The district court granted the motion. In upholding the facial validity of these three prison policies, the court determined that they reasonably related to legitimate penological objectives. The court, however, did not discuss Thompson's as-applied challenge to the anarchy-related mail policy. Thompson appealed.

## II.

All inmate challenges to the conditions of confinement implicate two bookend principles. At one end, it is clear that incarceration does not strip inmates of all constitutional protections. *See Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Should "a prison regulation or practice offend[ ] a fundamental [ ] guarantee" accorded Thompson by the Constitution, the federal courts stand ready to "discharge their duty to protect [his] constitutional rights." *Id.* (quotation omitted). "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Id.*

At the other end, it is clear that the constitutional rights of inmates are "more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy,* 532 U.S. 223, 229, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001). Recognizing that the federal judiciary is "particularly ill equipped to deal with" the "complex and intractable" problems of prison administration, we "generally [ ] defer[ ] to the judgments of prison officials in upholding [ ] regulations" like those challenged here. *Id.* (citation and quotation omitted). "Where, as here, a state penal system is involved, federal courts have additional reason to accord deference to the appropriate prison authorities." *McKune v. Lile,* 536 U.S. 24, 37, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (quotation omitted).

Accordingly, while inmates like Mr. Thompson may bring constitutional challenges to the conditions of their confinement, those challenges receive deferential review. So long as the prison regulation at issue "is reasonably related to legitimate penological interests," it will satisfy the Constitution. *Turner,* 482 U.S. at 89. In making this determination, *Turner* tells us to consider (1) whether the regulation advances legitimate and neutral penological interests, and whether the regulation is rationally related to those interests; (2) whether alternative means of exercising the right remain open to the inmates; (3) whether accommodation of the asserted constitutional right will have a marked impact on guards, inmates, and the allocation of prison resources; and (4) whether the regulation amounts to an "exaggerated response" to the problem. *See id.* at 89–90.

## A.

■ Applying these measures to the Department's policy of withholding mail advocating "anarchy" or containing "obscenity," we agree with the district court that the policy on its face satisfies the Constitution. *First,* prison officials have articulated a rational connection between the policy and legitimate and neutral penological interests. Maintaining security constitutes a legitimate penological interest, *Thornburgh v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), as does rehabilitating prisoners, *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). And regulations are " 'neutral' in the technical sense in which [the Supreme Court] meant and used that term in *Turner,* " when, as with these regulations, they "draw distinctions between publications solely on the basis of their potential implications for [a legitimate penological objective]." *Thornburgh,* 490 U.S. at 415–16. As for a "rational connection" between the policy and these interests, the issue is not whether the prohibited materials have in fact caused problems or are even "likely" to cause problems, but whether a reasonable official might think that the policy advances these interests. *See id.* at 417. Surely in this instance the relationship between the policy (prohibiting materials that advocate anarchy or contain obscenity) and the goals (security, order, and rehabilitation) is not "so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89–90. Because anarchy and obscenity are incompatible with security, order, and rehabilitation, this policy falls well within the realm of the reasonable.

*Second,* alternative means of exercising First Amendment rights remain open under the policy. According to the Supreme Court, the right in question must be read "sensibly and expansively." *Thornburgh,* 490 U.S. at 417. Here, the right in question is the right to receive and read publications. *See id.* at 417–18. And, as *Thornburgh* instructs, when the regulation permits "a broad range of publications to be sent, received, and read," as does the one here, a court must conclude that alternative means of exercising the right remain open. *See id.* at 418. *See also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 351–52, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (upholding a regulation restricting a Muslim practice where inmates were permitted to participate in other Muslim practices); *Turner,* 482 U.S. at 92 (upholding a regulation restricting communication among inmates where other modes of expression remained open).

*Third,* a policy permitting prisoners to receive materials that advocate anarchy or contain obscenity would have a significant impact on prison guards, other inmates, and the allocation of prison resources. We cannot ignore "the likelihood that such material will circulate within the prison[,] rais[ing] the prospect of ... [a] 'ripple effect.' " *Thornburgh,* 490 U.S. at 418. *See also Turner,* 482 U.S at 92. While, on this record, we have no reason to believe that Mr. Thompson will rise up against his jailors or engage in deviant sexual conduct should he possess such materials, we cannot discount the possibility that other more volatile prisoners will. Nor can we discount the costs of requiring prison administrators to allow some prisoners access to such materials while ensuring that others do not gain access to them. "[T]he courts should defer to the 'informed discretion' of corrections officials" on questions like these. *Thornburgh,* 490 U.S. at 418 (quoting *Turner,* 482 U.S. at 90).

*Fourth,* this regulation does not represent an "exaggerated response to the problem at hand." Mr. Thompson has not

met his burden of "point[ing] to an alternative that fully accommodates [his] rights at *de minimis* cost to valid penological interests." *Thornburgh,* 490 U.S. at 418. *See O'Lone,* 482 U.S. at 350 ("[P]lacing the burden on prison officials to disprove the availability of alternatives ... [would] fail[ ] to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators."). The only alternative proposed by Thompson–allowing him to receive these materials upon his promise not to disseminate them–would require prison officials to take him at his word or would require prison officials to devote considerable resources to verifying that he is keeping his word. Our modest role in reviewing constitutional challenges to prison rules does not permit us to require prisons to take such measures.

Nor, contrary to Mr. Thompson's position, does it make a difference that the policy grants prison officials broad discretion and that prison officials exercise this discretion differently in different Tennessee prisons. *Thornburgh* approved similar regulations in the face of a similar challenge. "Where the regulations at issue concern the entry of materials into the prison," the Supreme Court stated, "a regulation which gives prison authorities broad discretion is appropriate." 490 U.S. at 416. And where regulations allow for an assessment "under the conditions of a particular prison at a particular time," the Court explained, "[t]he exercise of discretion ... may produce seeming 'inconsistencies.'" *Id.* at 417 & n. 15. "[B]ut what may appear to be inconsistent results," the Court added, "are not necessarily signs of arbitrariness or irrationality [because] [g]iven the likely variability within and between institutions over time, greater consistency might be attainable only at the cost of a more broadly restrictive rule against admission of incoming publica-

tions." *Id.* at 417 n. 15. All things considered, this regulation does not violate the First Amendment on its face.

## B.

■ Mr. Thompson alternatively argues that this policy violates the First Amendment as applied to specific mail sent to him that advocates "anarchism." Thompson claims that, whether or not the policy validly targets materials that advocate "anarchy," prison officials unconstitutionally applied the policy to materials that discuss "anarchism." Anarchy and anarchism, Thompson adds, are distinct. *See Webster's Third New Int'l Dictionary* 78 (2002) ("[A]narchism" is "a political theory opposed to all forms of government and governmental restraint and advocating voluntary cooperation and free association of individuals and groups in order to satisfy their needs."). While anarchy assuredly represents an undesirable end, Thompson suggests, anarchism does not necessarily amount to a means to that end, because anarchism as a political philosophy opposes government, not order. *See The Oxford Companion to Philosophy* 31 (Ted Honderich ed., 1995) ("[A]narchism does not preclude social organization, social order or rules, the appropriate delegation of authority, or even of certain forms of government, as long as this is distinguished from the state and as long as it is administrative and not oppressive, coercive, or bureaucratic."). *See also* Henry David Thoreau, *Civil Disobedience and Other Essays* 1 (Dover Publ'ns. 1993) (" 'That government is best which governs not at all' and when men are prepared for it, that will be the kind of government which they will have."); Thomas Paine, *Common Sense* 65 (Kramnick ed., 1986) ("Society is in every state a blessing, but Government, even in its best state, is but a necessary evil; in its worst state, an intolerable one.").

In addressing this distinct constitutional claim, "the question remains whether the prison regulations, *as applied* to [Thompson], are 'reasonably related to legitimate penological interests.'" *Shaw v. Murphy,* 532 U.S. 223, 232, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (emphasis added). Thompson bears a "heavy burden" if he is to succeed on this claim. *Id.* He must "overcome the presumption that the prison officials acted within their 'broad discretion.'" *Id.*

Perhaps as a result of the informality of Mr. Thompson's pleadings, the district court did not separately explain why it rejected this as-applied challenge. Customarily, the absence of the district court's thinking on the point and the absence of the publications at issue in the record would be reason enough for remanding the case to allow the trial court to review the issue in the first instance. In this case, however, the Tennessee Attorney General argues that we should reject the argument as a matter of law because the State moved for summary judgment on all issues before the district court and Mr. Thompson failed to satisfy his burden of creating a fact dispute on any of them, including the as-applied challenge. We agree.

Thompson has not shown that he requested the challenged publications in discovery. He has not shown that the State improperly denied him access to the publications through discovery. And he has not shown that the district court improperly refused to order the State to produce the publications. To the extent he wished to preserve a meaningful as-applied challenge in this case, it was his duty to seek these publications in discovery, and it was his duty, to the extent discovery access to the publications improperly was denied, to ask the district court to order production of the documents. Thompson has not shown that he did any of these things. Nor has

he shown that when he received the State's motion for summary judgment, he either raised the access-to-the-publications issue or otherwise created a material fact dispute about the claim. Under these circumstances, the as-applied challenge must be rejected as a matter of law.

### III.

■ Mr. Thompson next claims that the district court erred in rejecting his First Amendment challenges to the Department's (1) "publishers only" policy and (2) "standard rate mail" policy. He is mistaken in both respects.

The "publishers only" policy, recall, prohibits inmates from receiving books, magazines, and newspapers from sources other than their publisher. We need not engage in a *Turner* analysis of this policy because precedent bound the district court, and binds us, in addressing this First Amendment challenge. In *Bell v. Wolfish,* 441 U.S. 520, 550, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court held that a "publishers only" rule for receiving hard cover books does not violate the First Amendment. This Court extended that rule to softcover materials in *Ward v. Washtenaw County Sheriff's Dep't.,* 881 F.2d 325, 330 (6th Cir.1989) (holding that a "publishers only" policy for receiving magazines does not violate the First Amendment). Nothing about the Department's policy or Thompson's challenge to it overcomes these controlling precedents.

Precedent likewise defeats Thompson's First Amendment challenge to the "standard rate mail" policy. In *Sheets v. Moore,* 97 F.3d 164 (6th Cir.1996), this Court upheld the constitutionality of a similar Michigan prohibition against what was then known as "bulk rate mail." *See id.* at 168–69. Since *Sheets,* this Court has upheld the constitutionality of the very same Tennessee policy at issue here, albeit in an

unpublished opinion. *See Jones v. Campbell*, 23 Fed.Appx. 458, 464 (6th Cir.2001) (holding that the Department's standard rate mail policy is reasonably related to legitimate penological objectives). We adhere to *Sheets* and *Jones* here.

■ Though the district court did not address the issue and the defendants did not brief it, we also read Thompson's *pro se* complaint and briefs to raise a due process challenge to the standard-rate mail policy. Thompson takes issue with the lack of notice to the inmate that occurs under the policy when standard-rate mail is received by the prison and either returned to its sender or destroyed. In the absence of notice that standard rate mail was rejected or destroyed, he argues that a prisoner cannot arrange to have first-class or second-class postage paid. This, he concludes, violates due process.

Thompson is wrong. He has not established a property or liberty interest in receiving non-subscription, standard-rate mail (and the policy does not affect subscription, standard rate mail). Without deprivation of a protected interest, he has no due process claim separate from his First Amendment claim, which we have already rejected. *See Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). *Cf. Procunier v. Martinez*, 416 U.S. 396, 408 n. 11, 417, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (holding that the "decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards," but noting that "[d]ifferent consideration may come into play in the case of mass mailings"), *overruled on other grounds by Thornburgh*, 490 U.S. at 413–14; *Prison Legal News v. Cook*, 238 F.3d 1145, 1152–53 (9th Cir.2001) (holding that an inmate is entitled to due process guarantees when prison officials withhold *subscription* bulk-rate mail). *But see Prison Legal News v.*

*Lehman*, 272 F.Supp.2d 1151, 1160 (W.D.Wash.2003) (holding that "the addressees of [non-subscription, standard rate] mail must be afforded the same procedural protections afforded to recipients of first class, second class, and subscription standard rate mail under Department regulations").

## IV.

■ Mr. Thompson raises three other contentions. He first contends that withholding mail from the "Anarchist Prisoners Legal Aid Network" denies him access to the courts in violation of the Fourteenth Amendment. In bringing this claim, however, Thompson offers no explanation how it differs from his First Amendment challenge to the mail policy and does not identify a single case addressing an access-to-courts challenge. We accordingly reject this claim as a matter of law. *See Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (requiring a plaintiff to allege and prove actual injury); *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir.1999) (affirming dismissal of an access-to-courts claim because plaintiff did not "allege that the incoming letter pertained to ongoing or anticipated litigation challenging either his sentence or the conditions of his confinement").

He next contends that the district court abused its discretion in not requesting an attorney to represent him. *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any such person unable to afford counsel."). We disagree. Were this a criminal case, the law would entitle Thompson to counsel. But the district court did not abuse its discretion by declining to "request" counsel here because this is ordinary civil litigation and because Thompson has not shown that he has a compelling claim.

Thompson, finally, argues that the district court abused its discretion in granting summary judgment to the prison officials without considering some discovery documents that Thompson attempted to file prematurely. No abuse of discretion occurred, however, because the district court did nothing to prevent Thompson from filing the materials in connection with his opposition to the defendants' motion for summary judgment. The court sensibly just prohibited him from filing the materials prematurely.

## V.

For the foregoing reasons, we AFFIRM.