PRISON LEGAL NEWS; Mark Wilson; Michael Tucker; Hung Le, Plaintiffs–Appellants,

v.

David S. COOK, Director of Oregon Department of Corrections; David Schumacher, Rules/Compliance Manager of Oregon Department of Corrections, Defendants–Appellees.

No. 99–36084.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 2000

Filed Feb. 7, 2001

Christina M. Hutchins, Assistant Attorney General, Salem, Oregon, for the defendants-appellees.

Samuel J. Stiltner, Seattle, Washington, for the plaintiffs-appellants.

Before: BEEZER, RYMER and GRABER, Circuit Judges.

BEEZER, Circuit Judge:

Prison Legal News ("Publisher"), publisher of a non-profit newsletter, and prisoners Michael Tucker, Mark Wilson and Hung Le ("Prisoners") appeal the district court's grant of summary judgment on their 42 U.S.C. § 1983 claims in favor of defendant officials ("Officials") of the Oregon Department of Corrections ("the Department"). We have jurisdiction pursuant to 28 U.S.C. § 1291 and reverse and remand.

I

This case concerns the constitutionality of the Department's policy of prohibiting the receipt of standard rate mail, as applied to subscription non-profit organization mail. The following facts are undisputed.

Since 1988, the Department has prohibited the receipt of bulk mail into Oregon prisons under the rationales that bulk mail is voluminous and generally of little value to prisoners; substantial staff is required to sort, inspect and distribute bulk mail; bulk mail poses security concerns; and bulk mail increases fire hazards. The Department regulation at issue prohibits all incoming mail except "express mail, priority mail, first class mail or periodicals mail." Or. Admin. R. 291–131–0025(8) (1998).[1] Oregon has the only prison sys-

---

1. Effective July 1, 1996, the United States Postal Service ("Postal Service") redefined its categories of mail. Mail that was previously

tem in the country that refuses to deliver subscription non-profit organization standard mail like that at issue.

The record shows that Oregon penal institutions process a substantial amount of mail. Prior to the enactment of the ban on bulk mail, the state penitentiary reported receiving 500 pieces of bulk mail daily. An informal survey taken in 1994 revealed that the penitentiary mailroom staff processed 5000 to 8000 pieces of first class mail daily. In July 1999, the mailroom staff reported receiving 662 pieces of standard mail in five days, including 172 pieces of non-profit organization mail. The Snake River Correctional Institution ("Snake River") reported that it receives, on average, 7000 to 8000 pounds of incoming mail a month. Snake River also reported that over a four-day period in January of 1999,[2] it received 296 pounds of standard mail and that, over a five-day period in the same month, it received 348 pounds of standard mail. The state's Correctional Institution ("Correctional Institution") reported that over a five-day period in July of 1999, it received 288 pieces of standard mail, 86 of which were non-profit organization mail.

Department regulations establish procedures for processing incoming mail applicable at all of its penal institutions. First, all incoming inmate mail is sorted into two categories: express, priority, first class and periodicals mail is kept for further processing. All other mail, including standard mail, is returned to the Postal Service.[3] A prisoner has no way of knowing that a particular piece of standard mail addressed to the prisoner was returned or destroyed. In general, the regulation itself provides notice that standard mail will not be delivered. After the mail is sorted, mailroom staff reviews the envelopes of acceptable mail for proper address and return address information. Next, mailroom staff reviews the inmate addressee's housing history and writes the inmate's housing assignment on the envelope. If the inmate has been transferred to another institution, the mail is sent to that institution at the Department's expense. Incoming mail is then opened and inspected for content and contraband.

For each piece of mail that is opened and deemed unauthorized, mailroom staff must write a Mail Violation Notice for correspondence or a Publications Violation Notice for publications. When correspondence is opened and rejected, the mailroom staff member writes the reason for the rejection on a Mail Violation Notice, puts the notice in the envelope and returns the envelope to the sender. The inmate receives a copy of the violation notice and has 15 days to request administrative review of any rejection based on written or pictorial content. The non-inmate sender has 15 days to request review of any rejection. If a publication is rejected, notification and review procedures are the same, except that the inmate and the publisher have 30 days to request administrative review of a rejection.

If Department regulations were to allow standard mail, the Department's mailroom

---

designated as third or fourth class mail (bulk mail) is now classified as Standard A mail and Standard B mail, respectively. Standard A mail is further subdivided into two classes: "non-profit organization" mail and "regular/commercial" mail. Second class mail is now referred to as "periodicals." In 1998, the Department amended its mail regulations to reflect the new Postal Service designations.

2. Because the record shows that Oregon penal institutions receive more mail than usual during holiday months like December and January, we view these numbers as slightly more than average.

3. It is not clear what the Postal Service does with the returned bulk mail. A prison mail inspector testified in his deposition that Postal Service employees have told him, on different occasions, that the mail is destroyed, donated to non-profit organizations and given to charities. The Postal Service gave permission to one of Oregon's penal institutions to destroy standard mail on site, so standard mail sent to that institution gets destroyed there rather than returned to the Postal Service.

staff would be required to give standard mail the same attention it gives to first class and periodicals mail, detailed above.

Because non-profit organization standard mail is labeled on its face, it is feasible to separate such mail from other standard mail, although it is impossible facially to distinguish between non-profit organization *subscriptions* and other non-profit organization mail. In addition, although Oregon penal institutions receive a significant amount of *standard mail*, the amount of *standard non-profit organization mail* coming in over a selected two-week period was "next to nothing." Moreover, the record indicates that the state penitentiary processed and delivered notices from the Oregon Attorney General, Department of Justice Support Enforcement Division, which were labeled and mailed as "Bulk Mail" and were insufficiently addressed.

## II

The record identifies the problems experienced by Oregon state prisoners who desire to subscribe to materials published by non-profit organizations and mailed under special rates fixed by the Postal Service. Publisher Prison Legal News conducts its activity through a non-profit organization, which prepares and circulates newsletters addressing prison-related issues. Publisher qualifies to use Standard A "non-profit organization rates" to circulate its newsletter. These postal rates are substantially lower than rates for express mail, priority mail, first class mail or periodicals mail. Publisher has approximately 2600 subscribers, including prisoners, non-prisoners, professionals and institutions. Fifteen Oregon state prisoners subscribe to Publisher's newsletter. Several Department employees reviewed Publisher's newsletter and determined that the content rendered it acceptable for admission; that is, the newsletter is rejected strictly because of the Standard A postage rate. A prisoner

could receive a subscription to Publisher's newsletter provided that the material was posted using first class or periodicals mail rates.

Prisoners Mark Wilson, Michael Tucker and Hung Le are inmates at the state penitentiary. Wilson is a paid subscriber to Publisher's newsletter. Publisher formerly sent its newsletter to Wilson affixing first class postage, in compliance with Oregon prison regulations. According to Publisher's circulation director, this practice recently became too expensive. Consequently, Publisher sends all of its newsletters via standard rate mail. Because the Department prohibits standard mail, Wilson has not received his subscription to the newsletter since January of 1999.

Tucker also tried to subscribe to the newsletter but was informed by the editor that Publisher could not honor his request because of the Department's prohibition against standard mail. In addition, Tucker's subscription to a different newsletter was thwarted by reason of postal expenses incurred to meet the Department's mail regulations.

Le requested religious material from the International Prison Ministry, a non-profit organization that sends out solicited Bibles and other material using standard rate mail. Le received a letter from the chaplain explaining that the request could not be fulfilled because Oregon prisons would not deliver standard mail to prisoners.[4]

## III

We review de novo an order granting summary judgment. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). Viewing the evidence in the light most favorable to the nonmoving party, we determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See id.*

---

4. Prisoners make no specific argument about Le's claim on appeal, and we assume that it

has been abandoned.

■ Publisher and Prisoners first argue that the Department's regulation banning standard mail impermissibly infringes on their First Amendment rights. The Supreme Court makes clear that in the prison context, an inmate retains those First Amendment rights not "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800 (1974)). Furthermore, publishers who wish to communicate with inmates by sending requested subscriptions have a "legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). We are required to afford considerable deference to the expertise and decisionmaking of prison administrators. *See id.* at 407–08, 109 S.Ct. 1874; *Turner v. Safley*, 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

■ As a preliminary matter, we reject Officials' argument that the regulation banning standard mail does not implicate Publisher's and Prisoners' First Amendment rights because it results only in the loss of cost advantages. Officials point to the main effect of the Department's policy, which is to require non-profit organizations, entitled to use standard mail rates, to forego a cost advantage and use first class mail to send their newsletters to prisoners in Oregon institutions. *See Jones*, 433 U.S. at 130–31, 97 S.Ct. 2532 (holding that where other avenues remain available for the receipt of materials by inmates, the loss of "cost advantages does not fundamentally implicate free speech values"); *see also Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (relying on *Jones* ). In this case, although we agree that the Department regulation mainly affects economic interests, it is also clear that the regulation implicates both Publisher's and Prisoners' First Amendment rights. The speech at issue is core protected speech, not commercial speech or speech whose content is objectionable on security or other grounds. Nor does the receipt of such unobjectionable mail implicate penological interests. *Cf. Jones*, 433 U.S. at 131–32, 97 S.Ct. 2532 (noting that the speech at issue, the solicitation of membership in prisoners' union, raised security concerns because it was an "invitation to collectively engage in a legitimately prohibited activity"). Finally, paying a higher rate is not an alternative because the prisoner cannot force a publisher who needs to use, and is entitled to use, the standard rate to take additional costly steps to mail his individual newsletter.

■ In *Turner* the Supreme Court says: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S.Ct. 2254. There are four factors relevant to the *Turner* reasonableness inquiry: (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials. *Id.* at 89–90, 107 S.Ct. 2254. The same analysis applies to regulations affecting *publishers'* rights to send materials to prisoners. *See Thornburgh*, 490 U.S. at 413, 109 S.Ct. 1874 (applying *Turner* to regulations affecting incoming inmate mail regardless of the sender's identity).

■ The first element of the *Turner* test directs us to (1) determine whether the Department's regulation is legitimate and neutral; and (2) assess whether there is a rational relationship between the governmental objective and the regulation. We hold that tying the receipt of subscription non-profit newsletters to postal service rate classifications is not rationally

related to any legitimate penological interest put forth by the Department.[5]

In *Frost v. Symington*, 197 F.3d 348 (9th Cir.1999), we clarified that the level of scrutiny to be applied to the decisions of prison administrators depends on the circumstances in each case:

When the inmate presents sufficient ... evidence that refutes a common-sense connection between a legitimate objective and a prison regulation, *Walker [v. Sumner*, 917 F.2d 382 (9th Cir.1990),] applies, and the state must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational. On the other hand, when the inmate does not present enough evidence to refute a common-sense connection between a prison regulation and the [asserted] objective ..., *Mauro [v. Arpaio*, 188 F.3d 1054 (9th Cir.1999),] applies and, presuming the governmental objective is legitimate and neutral, *Turner's* first prong is satisfied.

*Id.* at 357 (internal quotation marks and citations omitted). *Frost* thus commands that if Publisher and Prisoners do not present sufficient evidence to refute a common-sense connection between the Department regulation and its stated objectives, "prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." *Mauro*, 188 F.3d at 1060. The only question is whether prison administrators reasonably could have thought the regulation would advance legitimate penological interests. *See id; Casey v. Lewis*, 4 F.3d 1516, 1521 (9th Cir.1993). If Publisher and Prisoners refute the common-sense connection, however, the Department must demonstrate that the relationship is not so "remote as to render the policy arbitrary or irrational." *Mauro*, 188 F.3d at 1060 (quoting *Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254).

The first purported justification for the regulation is that standard mail often contains contraband; banning all standard mail reduces the time spent by mailroom staff searching for contraband and the likelihood that contraband will end up in the prison. The Department has presented no evidence supporting a rational distinction between the risk of contraband in subscription non-profit organization standard mail and first class or periodicals mail. *See Crofton v. Roe*, 170 F.3d 957, 960 (9th Cir.1999).

Second, the Department and its Officials assert that the ban on standard mail helps reduce fire hazards by limiting the quantity of flammable material in inmates' cells. Publisher and Prisoners respond that Department regulations restricting the amount of property inmates can possess already address this concern. *See* Or. Admin. R. 291–117–0005. The fact that Department property regulations already limit the amount of material an inmate can possess and the fact that inmates could conceivably receive bulk mail materials if sent first class refute the common sense connection between the refusal to deliver subscription standard mail and the reduction of fire hazards. The Department emphasizes that the accumulation of flammable materials is such a concern that the prisons conduct fire drills every 90 days. Publisher and Prisoners are not asking that all standard mail be delivered, however; they are asking only that personal subscriptions be delivered. It is irrational to believe that delivering the small amount of subscription non-profit organization standard mail that comes into Oregon prisons would significantly contribute to paper accumulation and increased fire hazards, as the total amount of mail prisoners may store in their cells is currently limited by property regulations. *See Crofton*, 170 F.3d at 960.

Third, the Department and its Officials state that the regulation increases the effi-

---

**5.** Because we conclude that there is no rational relationship, we do not address Publisher's and Prisoners' argument that the regulation is not neutral, which is supported by the fact that the Department processed and delivered notices to inmates from the Oregon Attorney General that were insufficiently addressed and mailed at the standard rate.

ciency with which random cell inspections can be conducted. They argue that the accumulation of standard mail in a cell creates a good environment for hiding contraband. The fewer materials in the cell, the better a correctional officer can conduct a search. The property regulations mentioned above address this concern, however, and the quantity of additional subscription mail, once processed, would be minimal. The regulation is not rationally related to the Department's interest in rendering efficient cell searches.

The final objective purportedly furthered by the regulation is the enhancement of prison security. The Department and its Officials assert that the ban on standard mail allows mailroom staff to concentrate its efforts on timely processing acceptable mail and thoroughly inspecting such mail for content and contraband. Publisher and Prisoners respond that processing *subscription non-profit organization* standard mail would not substantially deplete prison resources and would not add significantly to the mailroom staff's workload. We agree. The reality is that all incoming mail must be sorted. The record shows that distinguishing between non-profit organization standard mail and regular/commercial standard mail is not unduly cumbersome, particularly in light of the relatively insignificant amount of incoming non-profit organization standard mail received at the Department's several facilities.

The Department counters that although mailroom staff can separate standard mail from non-profit organization standard mail, it cannot readily distinguish subscription non-profit organization mail from unsolicited non-profit organization mail. To make such a distinction, the Department states that it would have to (1) create an active list of all names of all prisoners who subscribe to non-profit organization publi-

cations; (2) make the list available to all Department facilities; (3) provide personnel to update the list daily; (4) check all non-profit organization mail against the master list to ensure that it is subscription mail and that the subscription is current; and (5) process all subscription non-profit organization mail in the same manner as first class and periodicals mail and afford prisoners and publishers notice and review of rejections. We do not believe that requiring the delivery of non-profit organization standard mail will unduly burden the Department.[6] The Department and its Officials ignore the fact that at issue is the addition of 15 to 30 pieces of mail to the 5000 to 8000 pieces of acceptable mail that are processed at some Department institutions daily. Furthermore, the fact that the Department was able to process improperly addressed bulk mail sent by the Oregon Attorney General's office suggests that the Department exaggerates the administrative burden that processing subscription non-profit mail would impose. The Department's concern that limiting the ban would encourage inmates to increase their subscriptions and lead to an unmanageable influx of subscription non-profit standard mail can be addressed by other regulations. For example, current Department regulations requiring proper address and addressee information and restricting content would apply to the additional mail and would help control volume. *See* Or. Admin. R. 291–131–0025(1); Or. Admin. R. 291–131–0035.

The rational relationship factor of the *Turner* standard is a sine qua non. *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990). Because the Department and its Officials have failed to show that the ban on standard mail is rationally related to a legitimate penological objective, we do not consider the other *Turner* factors. Rather, we are required to reverse.[7] *See id.*

---

**6.** We note here that because "a personal subscription of a particular publication more nearly resembles personal correspondence than a mass mailing," such subscriptions deserve more attention than bulk mail. *Miniken*

*v. Walter*, 978 F.Supp. 1356, 1362 (E.D.Wash. 1997).

**7.** At oral argument, the Department and its Officials contended that a holding in this case that the ban on standard mail is unconstitu-

## IV

Publisher and Prisoners also argue that the district court improperly determined that the Department's Officials are entitled to qualified immunity. We disagree. We review de novo a district court's determination regarding qualified immunity in a § 1983 action. *Newell v. Sauser,* 79 F.3d 115, 117 (9th Cir.1996). The Officials are entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). We analyze qualified immunity claims using a two-step inquiry; we ask (1) whether the law governing the official's conduct was clearly established at the time of the conduct; and, if so, (2) whether under that law a reasonable official could have believed the conduct was lawful. *Robinson v. Solano County,* 218 F.3d 1030, 1034 (9th Cir.2000).

Because the "contours" of Publisher's right to send and Prisoners' right to receive subscription non-profit organization standard mail were not "sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right," *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the law in this case was not "clearly established." A number of cases support this view. In *Sheets v. Moore,* the Sixth Circuit upheld a regulation prohibiting "[f]ree advertising material, fliers, and other bulk rate mail except that received from a recognized religious organization sent in care of the institutional chaplain." 97 F.3d 164, 165 n. 1 (6th Cir.1996). Language in that case, however, distinguished between bulk rate mail and personal subscriptions, without directly addressing subscription bulk rate mail. *See id.* at 167. In *Miniken v. Walter,* on the other hand, a district

court struck down a ban on bulk mail as applied to subscription non-profit organization mail such as Publisher's newsletter. 978 F.Supp. 1356 (E.D.Wash.1997). This ruling was based, in part, on the fact that publications like Publisher's newsletter did not fall within the prison regulations' own definition of "bulk mail." *See id.* at 1361. Moreover, two Oregon district judges have upheld the Department regulation at issue in unpublished decisions. *See Hunter v. Baldwin,* Civ. No. 93–1579 (Or.1995), *aff'd on other grounds,* 78 F.3d 593 (9th Cir. 1996) (table decision) (upholding former Or. Admin. R. 291–131–0025(8)); *Morrison v. Hall,* Civ. No. 93–6383–HO (Or.1998). Although unpublished decisions carry no precedential weight, Department Officials may have relied on these decisions to inform their views on whether the regulation was valid and whether enforcing it would be lawful.[8]

## V

Last, Publisher and Prisoners argue that the Department's failure to provide notice and administrative review of standard mail rejections deprives inmates and publishers of due process safeguards required by *Procunier v. Martinez,* 416 U.S. 396, 417, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (holding that the "decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards"), *overruled on other grounds by Thornburgh,* 490 U.S. at 413–14, 109 S.Ct. 1874. Due process guarantees apply only when a constitutionally protected liberty or property interest is at stake. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Because we decide that Publisher and Prisoners have a constitutionally protected right to receive subscription non-profit organization standard mail, it follows that

---

tional as applied would pose problems for the Department under Article I, Section 8, of the Oregon Constitution. We do not address this argument because the issue was not factually developed before the district court and was not presented to us in the briefs.

8. Although the individually named Officials in the instant case were not parties to the prior cases, the Department had notice of the unpublished dispositions.

such mail must be afforded the same procedural protections as first class and periodicals mail under Department regulations.

### VI

We hold that the Department's ban on standard rate mail is unconstitutional as applied to subscription non-profit organization mail. We reverse the summary judgment in favor of Officials and remand for further proceedings consistent with this opinion. We grant Publisher's and Prisoners' request for reasonable attorney's fees, to be fixed on remand to the district court. *See* 42 U.S.C. § 1988.

REVERSED AND REMANDED.