PRISON LEGAL NEWS,
et al., Plaintiffs,

v.

Joseph LEHMAN, et al., Defendants.

No. C01–1911L.

United States District Court,
W.D. Washington,
at Seattle.

June 17, 2003.

Jesse Andrew Wing, MacDonald, Hoague & Bayless, Seattle, WA, for plaintiffs.

Carol A. Murphy, Attorney General's Office, Criminal Justice Division, Olympia, WA, Kasey Myhra, Betts, Patterson & Mines, Seattle, WA, Shannon Elizabeth Inglis, Attorney General's Office, Criminal Justice Division, Olympia, WA, for Defendants.

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

LASNIK, District Judge.

### I. INTRODUCTION

This matter comes before the Court on cross motions for summary judgment filed by plaintiffs Prison Legal News and Rollin Wright (collectively, "PLN") and defendants Joseph Lehman, *et al.* (collectively, "the Department"). For the reasons set forth in this Order, the Court grants in part and denies in part PLN's motion (Dkt.# 67) and grants in part and denies in part the Department's motion (Dkt # 80).[1]

### II. DISCUSSION

**A. Background.**

PLN is a Washington nonprofit corporation that publishes and distributes publications regarding prisoners' rights, prison conditions, and prison-related news. PLN publishes a monthly subscription magazine, *Prison Legal News Working to Extend Democracy to All.* The magazine's editor, Paul Wright, is a Washington State correctional facility inmate, as are a number of PLN's contributing writers. (Miniken Decl. ¶ 6). PLN has just under 3,000 *Prison Legal News* subscribers in all

---

**1.** Each party moved to strike evidence submitted by the other. *See* PLN's Response at 2–4 (motion to strike evidence of mail volume); Department's Response at 20–22 (motion to strike exhibits summarizing deposition testimony). Although the Court would reach the results set forth in this Order even if this evidence had not been submitted, the Court denies the parties' motions to strike.

fifty states *Id.* ¶ 8. Approximately 120 subscribers are inmates in Washington State correctional facilities. *Id.* ¶ 9.

The individual defendants are policy-making employees of the Washington Department of Corrections, including the Department Secretary, Deputy Secretary / Office of Correctional Operations Director, Regional Administrator, former Regional Administrator, nine superintendents, and one associate superintendent. (PLN's Motion at 5–6). The Department operates fifteen correctional institutions, including eight major institutions, housing approximately 16,000 inmates. (Vail Decl. ¶ 3). The Department employs approximately one mailroom staff person per 600 persons served at an institution, including both inmates and staff. *Id.* ¶ 6. The Department's Policy Directive 450.100, "Mail for Offenders," ("DOC 450.100") sets forth rules and procedures regarding offender mail. *See* Doonan Decl. Ex. 2 (DOC 450.100).

Two of the policies set forth in DOC 450.100 are particularly important here. First, the directive prohibits inmates from receiving "bulk mail" unless that bulk mail is a subscription publication.[2] *Id.* at 6. In contrast to first and second class mail rejected due to prohibited content, "[n]o rejection notice is required for bulk mail that is not a subscription publication." *Id.* Additionally, inmates are not permitted to receive catalogs by mail, whether sent first class, second class, or at a "bulk mail" rate.[3] *Id.* at 5. If mail other than that constituting bulk mail is rejected for delivery, inmates receive notice of the rejection and may appeal the decision. *Id.* at 8–9.

Pursuant to postal regulation, as a nonprofit corporation PLN is exempted from paying full postal rates. "Organizations and groups eligible for the Nonprofit Standard Rate are permitted to mail letters and other materials for about forty-three percent less than the rate paid by businesses operated for profit." *United States v. American Target Adver., Inc.*, 257 F.3d 348, 352 (4th Cir.2001). PLN sends *Prison Legal News* and a substantial portion of other correspondence to inmates under the "standard rate." Savings from sending mail at the standard rate are significant: a one ounce letter sent first class costs 37 cents, while a 3.3 ounce letter sent at the standard rate costs 16 cents. (Miniken Decl. ¶ 11).

PLN alleges that several of the Department's practices violate its First Amendment right to communicate with inmates. In particular, PLN challenges the catalog and bulk mail bans.[4] *See* Amended Complaint ¶¶ 3.1–3.14, PLN's Motion at 41–64. Additionally, PLN alleges that the Department has wrongfully denied it "approved vendor" status and that the Department's failure to provide inmates third-party legal materials sent by PLN is unconstitutional

---

**2.** The Department defines "bulk mail" as "[m]ail which is clearly marked 'non-profit' or 'bulk rate'. This type of mail is also referred to as bulk business mail or advertising mail and includes, but is not limited to, catalogs and circulars." (Wilkinson Decl. Ex. 7 at 3).

**3.** The Department defines "catalog" as "[a] publication which is predominantly or substantially focused on offering items for sale." (Wilkinson Decl. Ex. 7 at 4).

**4.** In addition to arguing that the catalog and bulk mail bans violate the First Amendment

as not being reasonably related to legitimate penological interests, PLN challenges the restrictions as unconstitutionally vague, unconstitutionally overbroad, and subject to preemption by federal postal regulations. *See* PLN's Motion at 41–46, 51–52 Because the Court finds that the catalog and bulk mail policies are not reasonably related to legitimate penological interests under *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court does not address these arguments.

censorship. *See* Amended Complaint ¶¶ 3.15–3.25, 3.38–3.43, PLN's Motion at 64–69. Finally, PLN contends that the Department's failure to notify PLN or inmates when standard rate mail or catalogs are received by the mailroom and not delivered to the addressees fails to meet minimum due process requirements. *See* Amended Complaint ¶¶ 3.26–3.37, PLN's Motion at 69–71.

## B. Summary Judgment Standard.

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

## C. The Catalog and Bulk Mail Prohibitions.[5]

■ Publishers have a "legitimate First Amendment interest" in communication with prisoners by mail. *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir.2001) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 408, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)). However, "prisoners' constitutional rights [and also the rights of those who send mail to prisoners] are subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security." *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir.1990). Therefore, prison policies that infringe upon this First Amendment right of communication will be upheld if "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

### 1. The *Turner* Inquiry.

■ *Turner* "set[s] forth the standard for evaluating prisoners' constitutional claims." *Walker*, 917 F.2d at 385. To guide courts in determining whether a challenged regulation is "reasonably related to legitimate penological interests" *Turner* established a four-factor inquiry.

(1) whether the regulation is rationally related to a legitimate and neutral governmental objective,

(2) whether there are alternative avenues that remain open to the inmates to exercise the right,

(3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and

(4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Prison Legal News*, 238 F.3d at 1149 (citing *Turner*, 482 U.S. at 89, 107 S.Ct. 2254). A court should afford "considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world," though the *Turner* test "is not toothless." *Thornburgh v. Abbott*, 490 U.S. 401, 408, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

### a. Rational Relation to Legitimate and Neutral Governmental Objectives.

The first element of the *Turner* test requires a court to "(1) determine whether the [defendant's] regulation is legitimate and neutral, and (2) assess whether there is a rational relationship between the governmental objective and the regulation." *Id.* Although PLN alleges that the Department has demonstrated bias against it and that the policies are not uniformly applied, PLN does not appear to challenge the neutrality of the regulations, and therefore

---

**5.** Because the Department's justifications for the catalog and bulk mail prohibitions are identical, the Court simultaneously analyzes the constitutionality of both policies.

the Court turns directly to the question of whether there is a rational relationship between the Department's objectives and the regulations.

■ When a plaintiff presents evidence to refute a "common-sense connection" between a legitimate objective and a prison policy, the defendant "must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." *Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999). However, if the plaintiff fails to come forward with such evidence "prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir.1999). For the reasons set forth below, the Court finds that PLN has presented evidence sufficient to rebut the "common-sense connection" presumption. Therefore the Court considers both PLN's evidence and the Department's counter-evidence, all of which relates to whether the policies are rationally related to minimization of contraband, detection of contraband, and reduction of the risk of fire in Washington State correctional facilities.

### i. Reduction of Volume of Mail that may Contain Contraband.

The Department submitted excerpts from the deposition of defendant Scott Frakes in which he stated that "the bulk mail often is in fact bulky, and to adequately search through it, [to] make sure that contraband is not hidden in mail ... takes a lot of resources." (Inglis Decl. Ex. 23, at 41). The Court does not doubt that searching mail is time consuming. However, there is no rational relation between a policy banning catalogs and bulk mail and the penological objective of reducing the volume of mail that may contain contraband. As a matter of common sense and the defendants' experience, it is far more likely that contraband would be contained in personal first class mail from, for example, an inmate's friends or family members, than in bulk mail, which consists of identical pieces of mail sent to numerous recipients. *Cf. Prison Legal News*, 238 F.3d at 1150 (finding "no evidence supporting a rational distinction between the risk of contraband in subscription non-profit organization standard mail and first class or periodicals mail").

### ii. Reduction of Volume of Mail Generally.

The Department argues that the ban on catalogs and bulk mail is justified because it reduces the overall volume of mail, allowing mailroom staff more time to examine first class mail, second class mail, and subscription bulk mail. (Department's Response at 27–28). "The volume of mail received in a given day will impact the degree of inspection taking place in prison mailrooms ... The greater the volume of mail, the more time staff must dedicate to reviewing and screening mail, and if the volume becomes unmanageable, then screening becomes less successful and a greater chance exists that contraband or other prohibited items will be introduced inside the institutions." *Id.*

PLN contends that if the Department were to provide what PLN argues is constitutionally required notice of rejection of bulk mail and catalogs, *see* Section II.D, *infra*, the bulk mail and catalog bans would consume more staff resources than would a policy allowing such mail. (PLN's Motion at 56–57). Additionally, PLN argues that the actual volume of such mail is minimal compared to the actual volume of mail received at Washington correctional facilities, and that "banning all catalogs or bulk mail is an arbitrary method of reducing the flow of mail." *Id.* at 57–58.

Other courts have considered this justification for bans on certain types of mail. For example, in *Prison Legal News* the plaintiffs challenged the Oregon Department of Corrections' ban on mail sent at the standard rate as applied to subscription publications sent by a non-profit organization. *Prison Legal News*, 238 F.3d at 1149. Noting that "[t]he reality is that all incoming mail must be sorted," the court found that allowing subscription, non-profit organization standard mail "would not substantially deplete prison resources and would not add significantly to the mailroom staff's workload." *Id.* at 1151. The Oregon Department of Corrections then argued that "although mailroom staff can separate standard mail from non-profit organization standard mail, it cannot readily distinguish *subscription* non-profit organization mail from *unsolicited* non-profit organization mail." *Id.* (emphasis added). Recognizing that distinguishing subscription from unsolicited mail would pose challenges, the court stated that "[w]e do not believe that requiring the delivery of non-profit organization standard mail will unduly burden the Department." *Id.*

Similarly, in another case the Ninth Circuit held that an Oregon Department of Corrections policy that banned inmates from receiving standard rate mail was unconstitutional as applied to pre-paid, for-profit subscription publications. *Morrison v. Hall*, 261 F.3d 896, 905 (9th Cir.2001). The court held that the defendant's "efficient use of staff time" argument did not justify a ban upon for-profit subscription publications *Id.* at 903–04, *but see Alcala v. Calderon*, 1997 WL 446234 (N.D.Cal.1997) (finding that "volume of 'junk mail' makes the mailroom screening process difficult and slows the delivery of first class and legal mail" and upholding ban on such mail).

The Court finds that the Ninth Circuit's analysis of the "efficient use of staff time" argument in *Prison Legal News* and *Morrison* applies here. As the *Prison Legal News* Court noted, all incoming mail must be sorted. Although mailroom staff likely will need to spend more time analyzing the content of catalogs and non-subscription mail sent standard rate, the Court cannot find that a ban on such mail is rationally related to the goal of reducing contraband. "[P]rohibiting inmates from receiving mail based on the postage rate at which the mail was sent is an arbitrary means of achieving the goal of volume control." *Morrison*, 261 F.3d at 903–04.

PLN submitted evidence, based upon a five-day sample, that the Monroe Correctional Complex ("MCC") received only thirty-one catalogs and pieces of standard rate mail per day. (PLN's Motion at 10–11 (citing Mailroom Inspection Depositions and Gamble Deposition)). The Department argues that this number is misleading because "[i]f the catalog restriction did not exist and inmates could once again begin ordering catalogs individually, this amount would substantially increase." (Department's Response at 36). The same argument was raised and rejected in *Prison Legal News* Responding to the concern that lifting a ban on subscription non-profit standard mail would "lead to an unmanageable influx of" such mail, the court noted that the concern could be addressed by other regulations such as the "regulations requiring proper address and addressee information and restricting content." *Prison Legal News*, 238 F.3d at 1151. Similar departmental regulations will help control volume here. *See* Doonan Decl. Ex. 2 (DOC 450.100) at 3–6 (setting forth inmate address and return address requirements and content restrictions).

### iii. Fire Hazard.

The Department contends that because "[i]nmates can and do set fires" in cells "[a]ny additional paper in a cell can con-

tribute to an inmate's ability to start a fire, or to fuel a fire once it is started." (Department's Response at 28). However, the Department utilizes other regulations to address this concern:

> The following additional items are authorized in general population at close, medium, minimum, or pre-release facilities:
>
> 1. Books and periodicals in an amount not exceeding 2,160 cubic inch capacity (i.e., a carton 18″ × 12″ × 10″ or any other dimensions that does not exceed 2,160 cubic inches )
> 2. Unframed personal/family photographs, personal mail, journals or diaries, writing pads, pencils, pens, and personal papers in an amount not to exceed that which may be contained in a 432 cubic inch box (i.e., 6″ × 6″ × 12″ or any other dimensions that do not exceed 432 cubic inches).

(Wilkinson Decl. Ex. 6 (DOC 440.000, Personal Property for Offenders) at 3). The fire hazard justification has been rejected in a similar context where the correctional facility maintained a limit on the amount of paper material that an inmate may possess:

> The fact that Department property regulations already limit the amount of material an inmate can possess and the fact that inmates could conceivably receive bulk mail materials if sent first class refute the common sense connection between the refusal to deliver subscription standard mail and the reduction of fire hazards. It is irrational to believe that delivering the small amount of subscription non-profit organization standard mail that comes into Oregon prisons would significantly con-

tribute to paper accumulation and increased fire hazards, as the total amount of mail prisoners may store in their cells is currently limited by property regulations.

*Prison Legal News,* 238 F.3d at 1150 (citing *Crofton v. Roe,* 170 F.3d 957, 960 (9th Cir.1999)). That a greater volume of mail is certain to enter inmates' cells should the catalog and bulk mail ban be lifted (as opposed to the additional volume caused by the allowing subscription non-profit standard mail in *Prison Legal News*) does not save the fire hazard justification. *See Morrison,* 261 F.3d at 902 ("Although the number of subscription for-profit publications that enter the OSP may be greater than the number of subscription non-profit publications, because the OSP already regulates the quantity of possessions that prisoners may have in their cell, it is similarly 'irrational' to prohibit prisoners from receiving subscription for-profit mail on the theory that it reduces fire hazards."); *but see Alcala,* 1997 WL 446234, at *3 ("Restricting the flow of 'junk mail' may well reduce the amount of flammable material that an inmate will possess in his cell at any given time.")

### iv. Cell Search Efficiency.

The Department argues that "[t]he catalog and bulk mail prohibitions also assist custody staff because increased material in an offender's cell creates more opportunity for offenders to hide contraband, and also creates additional work as it takes more staff time to conduct cell searches and makes the searches less effective." (Department's Response at 28). This argument fails to establish a rational relationship between the bans and the cell search efficiency goal for the same reason that the fire hazard argument failed.[6] *See* Sec-

---

**6.** The Department argues that the offender personal property restrictions alone are insufficient to address the fire hazard and efficient cell search goals. "Allowing inmates to re-

ceive as many catalogs and as much bulk mail as they like, but requiring custody staff to constantly monitor and enforce the property

tion II.C.1.a.iii, *supra, see also Morrison,* 261 F.3d at 902 ("In light of the regulation limiting the total amount of property in a cell ... permitting inmates to receive for-profit, subscription publications could not possibly increase the total volume of cell materials."), *Prison Legal News,* 238 F.3d at 1151 (ban on non-profit subscription publications "is not rationally related to the Department's interest in rendering efficient cell searches").

**b. Conclusions Regarding Application of *Turner* Factors to Catalog and Bulk Mail Prohibitions.**

■ *Turner's* rational relation to legitimate and neutral governmental objective factor "constitutes a *sine qua non.*" *Walker v. Sumner,* 917 F.2d 382, 385 (9th Cir.1990). Because the bans on catalogs and non-subscription standard rate mail are not rationally related to legitimate penological objectives, the Court need not consider the other *Turner* factors, and must grant PLN summary judgment on these issues.[7] *Prison Legal News,* 238 F.3d at 1151.

**D. Notice of Rejection of Catalogs and Non–Subscription Bulk Mail.**

■ PLN argues that the Department's failure to provide notice and review of rejections of catalogs and standard rate mail deprives both PLN and the inmates of due process as required by *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). (PLN's Motion at 69–

71). Guarantees of due process apply only when the interest at stake is a constitutionally protected liberty or property interest. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "The Supreme Court has held that '[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment.' This liberty interest attaches not only to communications by letter, but also to a prisoner's receipt of subscription publications." *Krug v. Lutz,* 329 F.3d 692, 697 (9th Cir.2003) (citations omitted).

In *Prison Legal News* the court stated that because it had found the plaintiffs "have a constitutionally protected right to receive subscription non-profit organization standard mail, it follows that such mail must be afforded the same procedural protections as first class and periodicals mail under Department regulations." *Prison Legal News,* 238 F.3d at 1152–53. Here, because the Court has found that inmates have a constitutionally protected right to receive catalogs by mail and non-subscription standard rate mail, the addressees of such mail must be afforded the same procedural protections afforded to recipients of first class, second class, and subscription standard rate mail under Department regulations.

---

restrictions creates more work for custody staff, detracting from other responsibilities, and also creates more tension between inmates and staff." (Department's Response at 28–29). However, prohibiting inmates from receiving catalogs and barring mail sent at a certain postage rate are arbitrary means of reducing inmate-staff tension and minimizing staff work. *See* Section II.C.1.a.ii, *supra.*

**7.** The Department notes that United States District Court for the Eastern District of

Washington upheld a catalog ban similar to that at issue here. (Department's Motion at 8 (citing *Allen v. Wood,* 970 F.Supp. 824, 832 (1997))). Although the *Allen* Court upheld a catalog ban on the basis that it was rationally related to contraband, fire hazard, and efficiency goals, that opinion was issued before the Ninth Circuit rejected such justifications for similar policies in *Prison Legal News* and *Morrison.*

## E. Prohibition Against Publications not Mailed Directly from a Publisher or Retailer.

■ The Department prohibits delivery of "[p]ublications not mailed directly from the publisher/retailer."[8] (Doonan Decl. Ex. 2 (DOC 450.100) at 5). However, "[c]lippings of newspaper and magazine articles not mailed directly from the publisher/retailer are permitted in quantities identified in th[e] Policy Directive."[9] *Id.* PLN contends that the Department has wrongfully invoked this policy to prevent delivery of materials sent by PLN to inmate Paul Wright and that the policy is unconstitutional·as applied to PLN. (First Amended Complaint ¶¶ 3.15–3.25, PLN's Motion at 64–65). In contrast to the catalog and non-subscription standard rate mail prohibitions, the Court finds that application of the *Turner* inquiry to the ban on publications sent from other than publishers and retailers demonstrates that this policy is a permissible limitation on PLN's and the inmates' constitutional rights.

With respect to the first *Turner* factor, there is significantly less risk that a book or magazine sent directly from a publisher or retailer will contain contraband than a book or magazine sent from other individuals, such as an inmate's friends or family members. (Vail Decl. ¶ 20). Additionally, there is less risk that publications sent from publishers and retailers, as opposed to those sent by an inmate's friends or family members, will have been altered from their original forms. *Id.* ¶ 21. This is important because publications that have been approved by the Department for statewide distribution receive "[m]inimal inspection, if any," due to the minimal risk of contraband. *Id.* If the publisher/retailer restriction is eliminated, such publications will require more rigorous inspections "due to the greater possibility that [they are] altered or contraband is hidden between the pages." *Id.* The Court finds that the ban on publications sent from other than publishers or retailers is rationally related to the penological interest of reducing the introduction of contraband into correctional facilities.

The second *Turner* factor also favors finding the publisher/retailer rule is reasonably related to legitimate penological interests because inmates have "alternative means of obtaining reading material" that are not burdensome or insufficient. *Bell v. Wolfish,* 441 U.S. 520, 551, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Inmates may borrow books from libraries operated by the Washington State Library System, which includes 150,000 titles and which allows inmates to obtain books through an inter-library loan system linked with other Washington libraries. (Gonzalez Decl. ¶ 7). Additionally, inmates may purchase books and magazines from publishers and retailers. With respect to PLN's specific concerns about sending publications to inmates, it may purchase a magazine subscription on behalf of an inmate. Provided that the magazine meets the Department's content requirements and is sent from the magazine publisher, it should be delivered to the inmate. If PLN sells certain books it would qualify as a retailer for those books and would be permitted to send such books to inmates.[10]

---

**8.** The Department defines "publication" to consist of "reproduced handwritten or typed/printed or pictorial materials including books, periodicals, newspapers, magazines, and pamphlets." (Wilkinson Decl. Ex. 7 at 27).

**9.** The Department permits inmates to receive one magazine article per envelope and ten newspaper clippings per envelope. (Doonan Decl. Ex. 2 (DOC 450 100) at 5).

**10.** PLN argues that the Department's "application of an 'approved vendor' rule to publications PLN sends to its contributing writers is arbitrary and serves no purpose. Defendants do not apply the policy to books PLN sells. There is no justification for this distinc-

The third *Turner* factor requires consideration of "the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources." *Prison Legal News,* 238 F.3d at 1149. This factor favors upholding the publisher only rule because allowing prisoners to receive books and magazines from any source would consume more prison resources by requiring mailroom staff to more thoroughly search all mailed books and magazines.

Because there are no "easy and obvious" alternatives to the publisher only rule, the fourth *Turner* factor also favors upholding this policy.

Based upon the foregoing analysis of the *Turner* factors, the Court finds that the Department's publisher only rule is reasonably related to legitimate penological interests and therefore is not an unconstitutional violation of PLN's or the inmates' First Amendment rights. This result is in accord with several other opinions in which courts upheld similar restrictions. *See, e.g., Bell,* 441 U.S. at 549, 99 S.Ct. 1861 (holding that policy prohibiting receipt of

hard-cover books not sent directly by publishers, book clubs, or bookstores did not violate First Amendment), *Ward v. Washtenaw County Sheriff's Dep't,* 881 F.2d 325, 326 (6th Cir.1989) (upholding publisher only rule for newspapers, magazines, and books); *Kines v. Day,* 754 F.2d 28, 29 (1st Cir.1985) (same); *Hurd v. Williams,* 755 F.2d 306, 309 (3d Cir.1985) (same), *Cotton v. Lockhart,* 620 F.2d 670, 672 (8th Cir.1980) (same).

**F. Third–Party Legal Materials.**

■ PLN argues that the Department's refusal to deliver third-party legal materials PLN sends to inmates violates the First Amendment. (PLN's Motion at 66–69).

DOC 450.100 prohibits the delivery of "[m]ail containing information which, if communicated, could create a risk of violence and/or physical harm to any person." [11] (Doonan Decl. Ex. 2 at 4). The Department's glossary provides:

Third-party legal materials-Must meet the following requirements

tion" (PLN's Motion at 65). The justification for the distinction is that books are an effective way to introduce contraband into a correctional facility. *See Bell,* 441 U.S. at 551, 99 S.Ct. 1861 ("Hardback books are especially serviceable for smuggling contraband into an institution; money, drugs, and weapons may easily be secreted in the bindings.... They are also difficult to search effectively"). Although PLN is in the rare position of having an interest in providing publications to particular inmates (its editor and contributing writers) and being a book retailer, the Department's interest in maintaining a consistent policy regarding the introduction of publications by mail to its correctional facilities outweighs any hardship PLN must endure

**11.** Purportedly quoting DOC 450.100, PLN states that the Department permits inmates at major prisons to "possess third-party *legal materials* mailed to the offender from an outside sender provided the materials have been

previously screened for compliance with DOC 450.100, Offender Legal Mail[,] and are stamped 'approved third-party legal material.' " (PLN's Motion at 33 (emphasis in original) (purportedly quoting Wilkinson Decl. Ex. 5 (DOC 450.100))) Neither copy of DOC 450 100 before the Court (Doonan Decl. Ex. 2 and Wilkinson Decl. Ex 5) contains the quoted language. However, this does not appear to be relevant to this issue because the Department's prohibition against mail that could create a risk of physical harm to any person and the requirements for third-party legal mail set forth in the Department's glossary's definition of "legal materials" appear to be the bases upon which the Department bans certain third-party legal mail There appear to be no substantive differences between the language PLN quotes above and the Department's policy regarding such mail as discerned from the prohibition on mail that could create a risk of physical harm and the definition of "legal materials."

a. Mail which consists of judicial opinions (published and unpublished), reports and recommendations, orders, complaints or answers, settlement agreements, class action notices, legal briefs and memoranda, and motions, and

b. Mail which otherwise complies with DOC Policy 450.100 Mail for Offenders and has been stamped "approved third-party legal materials" by correctional staff. (DOC 590.500).

(Wilkinson Decl. Ex.7 at 20).

That the Department's policy prohibiting mail containing information that could create a risk of violence or physical harm to any person is facially constitutional requires little analysis.[12] The prohibition against such mail is rationally related to the legitimate penological interest of inmate and staff safety. PLN remains free to send and inmates may receive third-party legal material that does not contain such information. Allowing inmates to receive such information would have a negative effect upon other inmates and correctional facility staff. Finally, there appear to be no "easy and obvious alternatives" to such a prohibition.

■■■ PLN's complaints regarding the Department's application of these policies to third-party legal materials present more complicated questions. PLN challenges the rejection of well over one hundred third-party legal documents. *See* PLN's Motion at 35–38. PLN argues that much of the information that the Department censored on the basis of a risk of violence is available to inmates from other sources, such as television, *Prison Legal News*, newspapers, and federal and state court reporters. *Id.* at 66–68. Additionally,

PLN argues that certain of the documents pose no "articulable threat" and that the Department's "strong-arming" justification is overbroad. *Id.* at 67. PLN suggests that the Department's real motivation for the censorship of the documents at issue "is that the materials embarrass the [Department] and educate inmates how to file claims." *Id.* at 68.

For certain pieces of censored mail PLN may be correct. However, resolution of these issues requires highly fact-dependent inquiries that, on the basis of the evidence before the Court, are not amenable to summary determination. Because a court must view all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party, the Court cannot grant PLN summary judgment on these issues *Matsushita Elec Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Department is not entitled to summary judgment on these issues for the same reason.

**G. Qualified Immunity.**

■■■ The Department argues that if the Court finds that PLN's constitutional rights were violated, the individual defendants are entitled to qualified immunity from damages. (Department's Motion at 24).

■■■■ The individual defendants are entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Courts in the Ninth Circuit consider "(1) whether the law governing the official's conduct was clearly established at the time of the conduct; and, if so (2) whether

---

**12.** PLN does not appear to challenge facially the "information that could create a risk of

violence" regulation.

under that law a reasonable official could have believed the conduct was lawful." *Prison Legal News,* 238 F.3d at 1152 (quoting *Robinson v. Solano County,* 218 F.3d 1030, 1034 (9th Cir.2000)). A court may consider unpublished opinions in the qualified immunity analysis. *Prison Legal News,* 238 F.3d at 1152 ("Although unpublished decisions carry no precedential weight, [defendants] may have relied on these decisions to inform their views on whether the regulation was valid and whether enforcing it would be lawful."). Additionally, the decisions of other circuit courts of appeals, district courts, and state courts may be considered. *Sorrels v. McKee,* 290 F.3d 965, 970 (9th Cir.2002) (citing *Capoeman v. Reed,* 754 F.2d 1512, 1514 (9th Cir.1985)).

Although both *Prison Legal News* and *Morrison* are strong statements regarding the constitutional right to communicate with inmates by mail, the Court finds that because the "contours" of PLN's right to send and the inmates' right to receive catalogs and non-subscription standard rate mail were not " 'sufficiently clear that a reasonable official would understand that what he was doing violated [those] right[s],' the law in this case was not 'clearly established.' " *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). A prison official reasonably could have believed that the high degree of protection for communications with inmates announced in *Prison Legal News* and *Morrison* was limited to communication by subscription publication. Additionally, although prior to *Prison Legal News* and *Morrison,* courts in this circuit have up-

held similar policies. *See, e.g., Alcala,* 1997 WL 446234 (N.D.Cal.1997) (upholding ban on "catalogs, advertisements, brochures, and material whose primary purpose is to sell a product(s) or service(s) and when taken as a whole, lacks serious literary, artistic, political, educational, or scientific value"). Finally, courts in other circuits have upheld similar policies. *See, e.g., Dixon v. Kirby,* 210 F.Supp.2d 792, 800 (S.D.W.Va.2002), *aff'd,* 48 Fed.Appx. 93 (4th Cir.2002) (upholding catalog ban), *Kalasho v. Kapture,* 868 F.Supp. 882, 888 (E.D.Mich.1994) (upholding bulk mail ban); *Sheets v. Moore,* 97 F.3d 164, 169 (6th Cir.1996) (upholding ban on "free advertising material, fliers, and other bulk-rate mail except that received from a recognized religious organization sent in care of the institution chaplain").

Although the Court finds that the catalog and non-subscription standard rate mail bans are not reasonably related to legitimate penological interests, reading *Prison Legal News, Morrison* and other relevant opinions, a prison official reasonably (though wrongly) could have believed that the Department's policies were constitutional.[13] The Court therefore finds that the individual defendants are entitled to qualified immunity for damages from the catalog and non-subscription standard rate mail bans, and the Department's failure to notify inmates of mail rejected pursuant to those policies.[14]

## III. CONCLUSION

For the reasons discussed above the Court GRANTS PLN's motion for summary judgment (Dkt.# 67) and DENIES the Department's motion for summary

---

13. The Court also finds that a prisoner's liberty interest in uncensored communication by catalog and non-subscription bulk mail was not so clearly established as to preclude qualified immunity for the individual defendants on PLN's rejection notice claim.

14. This finding of qualified immunity is limited to the issues resolved in this Order The Court expresses no opinion regarding whether the individual defendants will be entitled to qualified immunity should PLN ultimately prevail on its claims regarding censored third-party legal materials.

judgment (Dkt.# 80) with respect to PLN's claims regarding the catalog ban, the bulk mail ban, and notification of rejection of catalogs and bulk mail. The Court DENIES PLN's motion and GRANTS the Department's motion with respect to PLN's claims regarding the publisher/retailer only rule. The Court DENIES both parties' motions with respect to PLN's claims regarding third-party legal materials. The Court GRANTS the Department's motion with respect to qualified immunity for damages from the catalog ban, the bulk mail ban, and mail rejection notification.

The Court further ORDERS that the Department is PERMANENTLY ENJOINED from prohibiting delivery of catalogs based only on the fact that the mail is a catalog and from prohibiting delivery of "bulk" mail based only upon the fact that the mail is sent at a standard rate This injunction shall take effect sixty days after the date of this Order.[15] This injunction in no way prohibits the Department from enforcing its content-based restrictions or other policies, such as inmate address and return address requirements.

The Court also STRIKES the trial date and deadlines set forth in the Amended Scheduling Order (Dkt # 43) and STAYS the pending motions in limine (Dkts # 110, 111).

The Clerk of the Court is directed to send copies of this Order to all counsel of record.

---

15. The Court recognizes that adjusting mail policies, training staff, and possibly re-allocating staff to comply with this injunction is a complex process that is likely to take a significant amount of time. For that reason the Court sets the effective date of the injunction for sixty days after the date of this Order.

At oral argument the Court directed the parties to engage in mediation in July of this year for the issues remaining in this litigation At that mediation the parties may discuss timing issues that may arise.